ONEIDA GENERAL TERM, January, 1851. *Gridley, Allen, and Hubbard,* Justices.

## BRONSON & CROCKER *vs.* WIMAN.

Where, on the trial of a cause, an exception is taken to the sufficiency of the proof of the contract sued on, and subsequently the defect is supplied by other evidence, such objection can not be used on a motion for a new trial, upon a case.

A contract was made between the plaintiffs and the defendant, oy which the latter sold to the former 2000 barrels of flour, to be delivered in Troy or Albany, as the purchasers should elect, at $4,94 per barrel; the flour to be the first 2000 barrels shipped from the defendant's mill, after the date of the contract. The plaintiffs agreed to receive such flour, and pay for the same in New-York funds. In an action by the purchasers to recover damages for the non-delivery of the flour, they proved that after the execution of the contract, they elected that the flour should be delivered to W. at Albany, and gave notice of their election to the defendant. They also notified him that W. would pay for the flour, on delivery. The plaintiffs also proved that W. was prepared to pay for the flour whenever it should be received; that he paid every demand against him, at that time, promptly; and that he had facilities for raising money to any amount he pleased, sufficient to pay for 2000 barrels of flour. *Held,* that this was sufficient evidence to go to the jury, of an ability and readiness, on the part of the plaintiffs, to pay for the flour on delivery; and that direct proof of their possessing the amount of the purchase money, in New-York funds, could not be required.

*Held also,* that from the proof of the plaintiffs' ability to raise an amount sufficient to pay for the flour, on delivery, the power to procure New-York funds, by the purchase of a draft, might be inferred.

Courts will take judicial notice of the common and ordinary modes of transacting commercial business; of the statutes establishing banks, and regulating the business thereof; and of the rates of exchange between the different cities of the state.

A contract to deliver 2000 barrels of flour, to be ground out of wheat which has been bargained for by the promisor, but not yet received, is not within the third section of the statute of frauds. (2 *R. S.* 136.) It is a contract for *work and labor* only, and not for the sale and purchase of goods.

A written contract, supposed to be voidable by reason of fraud, may be affirmed by parol.

What amounts to a ratification of a contract alledged to be void, for fraud.

Whenever a party to a contract has been defrauded, he may rescind or affirm

---

Bronson *v.* Wiman.

---

the bargain. But if he rescinds, he must do so *promptly*, as soon as he dis-covers the fraud, and this, whether the contract be executed or executory.

Where a party, with knowledge of all the facts, expressly re-affirms a con-tract, he is estopped from afterwards disaffirming it, by the principle of estoppel *in pais*.

Whatever would affirm a forged instrument, *a fortiori* is sufficient to affirm a beneficial contract, though it be tainted with fraud.

THIS was an action of assumpsit, to recover damages for the non-fulfillment of a contract made between the parties, by which the plaintiffs purchased from the defendant and the defendant agreed to deliver to the plaintiffs, at Troy or Albany, as they might direct, at $4,94 per barrel, two thousand barrels of flour. The cause was tried at the Oswego circuit, in February, 1850. On the trial, the plaintiffs proved the execution of the contract by the defendant, and by E. T. Bronson, on the part of the plaintiffs; and that E. T. Bronson was the son of one of the plain-tiffs, and acted as their agent and chief clerk, and was in the habit of giving notes, and signing checks and contracts for the firm. The defendant objected to the admission of the contract in evidence, on·the ground that its execution was not sufficiently proved; but the judge admitted the same, and the defendant excepted. The contract is set forth in the opinion of the court. A witness testified that the agreement was in E. T. Bronson's hand-writing. On the call of the plaintiffs' counsel, the defend-ant produced two letters written by the plaintiffs to the defend-ant. One dated October 20, 1845, which the plaintiffs' counsel read as follows:

"Oswego, Oct. 20th, 1845.

Truman Wiman, Esqr.

Dear Sir: You will please deliver the two thousand barrels of flour which we bought of you on the 16th inst., to J K. Wing, Esq'r, Albany, who will pay for the same as per contract. Will you please inform us whether you have shipped any of the flour, and if not, how soon you expect to ship it from here, and oblige                Yours, &c.

BRONSON & CROCKER."

The plaintiffs proved the delivery of this letter to the defendant in person on the day of its date. The other letter was dated November 20, 1845, which the plaintiffs read in evidence, as follows:

"Oswego, Nov. 20th, 1845.

T. Wiman, Esq'r: Sir—We must remind you of your contract made with us on the 16th of October last, by which you sold us 2000 barrels flour, to be delivered in Albany. The season is getting late, and we must now demand that you proceed to perform the contract, and deliver the flour as soon as possible to the care of J. K. Wing, Esq., Albany, who will pay you for the same as soon as delivered.          Yours respectfully,

BRONSON & CROCKER."

A witness testified that he delivered this letter to the defendant on the 21st of November, 1845; that he had been a clerk in the plaintiffs' counting house ever since; and that the flour had never been delivered, to his knowledge. The plaintiffs proved that the defendant was shipping flour, on the canal, in the year 1845. That the first he shipped, after the 16th of October, was on the 21st of that month, when he shipped 1125 barrels; and that he shipped several thousand barrels during that month and the next. J. H. Chipman testified, that in 1845 he was book-keeper for J. K. Wing, produce dealer at Albany; that the price of flour was less than $5, till about the 16th of October, when it took a rise; that the wholesale price, from the 28th of November to the 1st of December, was from $6,75 to $7; that on the 5th of November it was selling for $6,25, and on the 25th of October, at $5,50. That Wing had been advised of this contract, and had a copy of it; that he was prepared to pay for the flour in question whenever received, and that he would have paid for it, had it been received. The witness did not know whether the plaintiffs had funds in Albany, or not; but he knew that every demand against Wing was paid, at that time, promptly; and that he was preparing to pay for this flour if it arrived; that Wing had facilities for raising money to any amount he pleased, sufficient to pay for 2000 barrels of flour. The defendant moved for a nonsuit, on the ground that the

plaintiffs had not shown payment or performance, or any tender of payment or performance of the contract, on their part; also on the ground that the plaintiffs had not shown that they, or Wing, were ready to pay for the flour in question, or had, or could get, the New-York funds required by the contract, to pay for the flour, in Albany or elsewhere. The judge decided that the evidence was sufficient to be submitted to the jury, and denied the motion for a nonsuit.

The defendant then called as a witness Frederick T. Carrington, who testified as follows : " I am a miller at Oswego and was in 1845. I remember that about the 16th of October, 1845, there was news received of the advance in the price of flour in England. The news came by the steamer Great Britain : we had at Oswego at 7 o'clock in the morning of the 16th of October, the account of the said steamer's being off Nantucket, but no news or intelligence from her was received. I am not aware at what time the public first got the intelligence brought by the steamer. I received a note from Mr. Crocker about ten o'clock that day, cautioning me there were strangers in town buying flour, and not to sell to them. I had sold some flour and wheat that day to Mr. Crocker. I made my sales to Mr. Crocker about 9 o'clock A. M. The mail at that time arrived from the east between 5 and 6 o'clock A. M. and 5 and 6 o'clock P. M. There could have been no public intelligence from the steamer until after the evening mail." The plaintiffs thereupon offered to read the note from Crocker to Carrington, in evidence ; to which the counsel for the plaintiffs objected, on the ground that it did not appear to have been written prior to the sale to Wiman. To obviate the objection, the defendant called Walter W. White as a witness, who testified that he was present when Mr. Crocker came into Mr. Wiman's office, to make purchase of some flour from the defendant. It was about 10 o'clock in the forenoon when he came in—might have been a little earlier. That Edwin T. Bronson came and closed the bargain between 11 and 12 of the same day. The witness was not very sure as to the time ; but thought Crocker was at Wiman's office between half past 9 o'clock and before 10 o'clock in the forenoon. Neither Bronson nor

Crocker was present when E. T. Bronson closed the bargain. The said Carrington being further examined on the part of the defendant, testified as follows : "I think the advance in flour caused by the intelligence brought by the steamer, was from three to five shillings in the New-York markets. The price in Oswego about the 14th and 15th of October, 1845, was $4,50, and the freight 30 to 35 cents per barrel." The witness produced said note from Crocker to him, and testified that the same was in the hand-writing of Crocker, and received by the witness after the sale, and the same was read in evidence, as follows : "Dr. Sir : There are men just arrived from Syracuse to buy flour : don't sell to them, for I believe they have news that flour has risen—English news.                L. B. CROCKER."

On cross-examination, said Carrington testified : "I received the note in the forenoon. I have no positive knowledge that men came from Syracuse. I sold to a Troy man before I received the note. He gave me $4,62½, delivered here. I sold to him after I sold to Crocker, and before I received the note. I sold Crocker 1000 barrels at $4,50 here, and 10,000 bushels of wheat."

The counsel for the defendant then called as a witness *John H. Tomlinson,* who testified as follows : "I came here on the 16th of October, 1845. I got here about 8 o'clock in the morning. Henry Allen came with me; we started at nearly 4 o'clock in the morning. The distance from Syracuse to this place is about thirty-six miles. I came down in a light wagon drawn by a pair of horses. Drove the same horses through. I went to Crocker's office immediately, or soon after arriving. I think he was in. I went there for the purpose of buying wheat or flour of him, but did not buy. I asked him if he could purchase some, and he said he could. I told him I had received a letter from an Albany correspondent in whom I had confidence, directing me to buy at $5 or under, for flour delivered in Albany, and 8 shillings and sixpence for wheat. He said he would go out and see what he could do, and did. He inquired whether the price would be reliable, and I said I thought so, from the confidence I had in the writer. I told him

Bronson *v.* Wiman.

who it was. I also told him how the news came as to the rise; that there was an express run from Albany to Buffalo, by Livingston and Wells, and that I got my letter in that way ; but little, if any thing, was said of the steamer's having arrived. I was informed in the letter as to the arrival of the steamer, but said very little to him about the steamer. I do not know that I told him the steamer had arrived, but that is likely. I was informed by the letter of the arrival of the steamer. I have not the letter in my possession. I believe I sent it to Mr. Crocker. I think I did not show the letter to Mr. Crocker. I think I did not tell him of the rise in Albany or New-York. I do not now remember what steamer arrived, though I did at the time. I can not remember distinctly what was said about answering any question that might be put to Crocker about the news. I think there was nothing said about it the first time he went out. He was gone about three-quarters of an hour the first time. I remained in his office during that time. I think Crocker requested me to remain in the office and not be seen out. Mr. Crocker, when he went out, took a letter with him which he had received that morning, he said, from New-York. I think he took the letter as a reason for purchasing so largely. I don't remember who the letter was from. I did not read it. He told me that the papers of that morning announced that the steamer was off Nantucket, and the letter, I understood, contained nothing more than what was in the papers received that morning. I had not seen the papers of that morning. My intelligence was later than that contained in the papers, and though I told him but little, it is probable Crocker inferred that it was. I went to Crocker's office to buy wheat and flour of him. He said he had none to sell then. I asked him if I could purchase any in town. He said it was doubtful, for the steamer had been announced, and the sellers would decline selling to a stranger. I then inquired if he could purchase, and he said he thought he could. I told him I had a letter from a correspondent in Albany directing me to buy flour and wheat at certain prices. He inquired if I could rely on my intelligence. After I told him the prices, I told him I had not so much confidence in the news

as in the judgment of my correspondent. I had always found him prudent. I then told him my correspondent was J. K. Wing. The question then came up how much we should buy. I told him I was not particular. It would be well for him to see what he could get, and then return. He took his letter in his hand and went out. There was no one present at this conversation. When he came back we conversed again. I do not know but E. T. Bronson was present then a part of the time. It may have been at the third time. That conversation lasted perhaps 15 or 20 minutes, when I went to the Welland House. He brought me the proposals he got, and we decided what we would do. I think I stated to him that he must be expeditious in making the contracts. I might have told Crocker how long I was coming down; we met several times during the forenoon. We next met at his, Crocker's office. We might have been separated 20 minutes the second time. Before the third meeting the written contract with Wiman was closed. E. T. Bronson was sent out to close the contracts, after we concluded what to do. I was there when he was sent out. We gave him a list of such and such contracts, and told him to go out and close the contracts. He was directed to go to Bond & Stevens, Fitzhugh & Co., Lewis & Beardsley, Wiman, and I think another party. I think Crocker made the bargain with Carrington. I was there when E. T. Bronson came in with the contracts, or came in soon after. I was to have one-third interest in the contracts and profits, deducting the expenses of the express, Bronson &. Crocker one-third, and Wing one-third. I did not give, to my recollection, Crocker any information before closing the contracts. I am not certain of giving him any letter. I did not at the first interview. I either handed him the letter or sent it to him. It was after the first interview. I had no other information than what that letter contained. The letter is from Mr. Wing, in the hand-writing of Mr. Chipman, and addressed to me. I did not have the letter the first time I went to Bronson & Crocker's office. I left it in my overcoat at the Welland House. This is the letter, I think. I was at that time in the flouring business at Syracuse.

The defendant then called Walter W. White, who testified as follows, viz. : " I was clerk of the defendant in 1845, and was in his office on the morning of the 16th of October.  Mr. Rice was there, and the defendant, and myself, and no one else.  Mr. Crocker came into the office—it was as late as nine and a half o'clock or ten o'clock A. M.—and asked the defendant if he had any flour to sell.  He said he had an order from the east, (holding a paper like a letter in his hand,) to purchase from 1000 to 2000 barrels of flour, and wanted to get the defendant's lowest offer for the flour delivered in Albany.  Wiman said he had no flour to sell, that there was none in the mill, and that he had no wheat.  Mr. Crocker said, you expect wheat, I suppose ; to which Mr. Wiman replied that he did.  Crocker then wanted an offer for the first 1000 or 2000 barrels he might have to ship. Mr. Wiman then asked him if he had any news from the steamer, or English or foreign news.  Crocker said he had none but what came in the papers.  Wiman said, I have seen that.  He then had the New-York Evening Express in his hand which he had been reading.  Both of them mentioned that the steamer had been seen off Nantucket.  Crocker again asked for his price, and Wiman said he did not want to make a price, and did not think he could make a price Crocker would buy at.  Crocker said he was not prepared to buy then, but wanted to get his price, and was then going round to the other millers to get their prices, and then should make up his mind not to purchase at all, or take the lowest offer.  Wiman then asked him again if he had any news by the Great Britain.  Crocker replied, " nothing but what you all know."  Mr. Wiman then said, " if you have not any news, or any news more than I have, I will make you an offer."  He then made a price which was $4,94 per barrel, delivered at Troy or Albany.  Then something was said about the kind of money.  Wiman said he must have New-York city funds.  Crocker, after demurring, assented to have the offer so considered.  Crocker said he would let him know in one hour if he accepted the offer, to which Wiman assented."  Here the witness produced a newspaper which he testified was a copy of

the New-York Express of October 14th, 1845, received at Oswego on the morning of October 16th, 1845, and which was the newspaper the defendant had in his hands when Crocker came into the office. The counsel for the defendant thereupon read the following article from the newspaper, as follows:

" *The steamship Great Britain.* The city was thrown into some excitement to-day on the arrival of the Boston boat, by the intelligence that the Great Britain was seen off Nantucket with signals of distress flying." Said White further testified: " I was there in the defendant's office when young Bronson came in, some forty or fifty minutes after. He came in and said he had been sent over by Mr. Crocker to close the contract, and they had concluded to take the 2000 barrels. Wiman said to him, " I think you have got some news," and asked him if Mr. Crocker had not some news. Bronson said he did not know much about it, except what Mr. Crocker said, that there was no news that he knew of. Wiman asked him if he hadn't any foreign news, and he said he had not. Bronson then named over the conditions of the contract, and took his pen and wrote the contract at Wiman's desk. When he had finally got the contract written, Wiman hesitated about signing it, and said he believed they had some news more than he (Wiman) had. Bronson said he didn't know anything about any news. All he knew about it was what Crocker told him, to come over and close the contract. Wiman finally said if they had no more news than he had, he would sign the contract, and did so, and Bronson took it away. There was a duplicate of the contract, executed by both parties."

The counsel for the plaintiffs thereupon offered to read in evidence the letter from Wing to Tomlinson, brought by Tomlinson to Oswego on the 16th of October, 1845, to which the counsel for the defendant objected, on the ground (among others) that there was no proof that Crocker had seen the letter previous to closing the contract with the defendant. But the judge decided that the same was admissible and proper at this time, to which the defendant by his counsel excepted. The

Bronson *v.* Wiman.

plaintiffs' counsel then read said letter, in the words and figures following, viz. :

           " Albany, Oct. 15, 1845.

Mr. J. H. Tomlinson : Dear Sir—The steamer is in and the flour market all excitement ; flour is bo't at $5 quick, it will go to $5¼, I think. I write by an express. Buy all the flour you can get hold of, not to cost here over $5, and first rate wheat not to cost over 8-6 here and do as much better as you can. Sale of wheat to arrive at 8-8 this day. If you can get hold of any wheat and flour before the news is generally known I would do it at once on joint acc't. I would not operate to cost here over $5 for good Genesee flour and wheat to cost over 8-6. More to-night.      Truly yours,      J. K. Wing,

           Pr. J. H. Chipman."

The counsel for the plaintiffs then recalled said James H. Chipman, who testified as follows, viz. : " I copied this letter from one Wing wrote, addressed to said Tomlinson, and sent it by private conveyance. I think the news of the steamer came by express from Springfield. I think the steamer got out of her course, and the news came by way of Boston or Springfield. On his cross-examination, said Chipman testified : I believe I sent the letter by Jeremiah Nottingham, who came up on the cars. I knew that the flour was to be purchased on joint account for Tomlinson and Wing. There had been no dealings between Bronson & Crocker and Wing. No other partners than Tomlinson was contemplated. It was sent off by an express car which left Albany about noon of the 15th October, and Nottingham got on to the engine. The express was a special express sent off by the railroad companies to give news of the rise of flour out west. The news arrived that morning at Albany from Springfield, as it was said, but I don't know how the news came to Albany ; it was said flour was worth immediately after the news, from $5 to $5,25 per barrel."

The plaintiffs then called as a witness, Edwin T. Bronson, who testified as follows, viz. : " I am a clerk for the plaintiffs and have no interest in this suit, or in the contract. I was chief clerk for the plaintiffs in October, 1845. I recollect that

Tomlinson was at our office on the 16th of October. I went over to Wiman's office to close a contract with him. I had not seen Crocker and Tomlinson together before I went. I had not seen Crocker before he went out the first time that morning. I found him in the office when I came in. In about half an hour I was sent by Crocker to close the contract with Wiman. I first asked Wiman as to the terms of the contract, to see if he and Crocker agreed; and, after accommodating some discrepancies, I drew a contract, and it was signed. I stated what I understood to be the contract, and he did also. The price was mentioned, and he said he had the option to make the contract for 1000 or 2000 barrels. I said we wanted the 2000 barrels, and that it was our option to take 1000 or 2000 barrels, as Crocker understood it. There was some conversation about the inspection, about news, and New-York funds. It lasted, perhaps, fifteen or twenty minutes. He said one object was to save inspection, and that we must pay it. I told him it was probable that it would not be inspected, and that it was not worth while to put it in the contract. I drew one contract without putting in any thing about inspection. He objected to it, and I drew another and put that in. He said he must have New-York funds, to save exchange, but did not say that that was a part of the contract with Crocker. Wiman then said to Dickinson, ' what do you say, captain ? Is it best to go it ?' Dickinson said, he guessed he had better do it. He had made some money on the flour, and that he supposed it was a good trade. While I was there Wiman said he had made a dollar a barrel, and was satisfied. In the course of the conversation, Wiman said, ' I guess you must have some news.' I told him that our last advices from New-York were, that flour was a little firmer. That we had a letter from Buckley & Co. that morning, saying that flour had become a little firmer in anticipation of the steamer's news. That the Great Britain was telegraphed, but they had no news from her. That was the substance of the communication we received that morning from Buckley & Co. Previous to signing the contract, he said, ' you are sure you hav'nt got any news.' I told him that letter was the last we had

from New-York, and then there was no news from the steamer.
The contract was then signed. I drew the contract which was
signed by both parties; then made a copy of it, which was
signed by me for the plaintiffs, and left with Wiman. I did not
see the letter till after the contract was closed with the defend-
ant. Flour was bought that day, at Oswego, at less than the
price paid to the defendant. The information of the arrival of
the steamer was public during the day some time. The mail
arrived then between four and five o'clock in the afternoon. I
went to get the letter from Tomlinson, which he had received,
to see what the news was. Crocker sent me. I could not find
him, and we concluded to take the flour at any rate. I am the
son of one of the plaintiffs." George L. Dickinson testified that
he went with young Bronson into Wiman's office, but he could
not relate the whole conversation between Bronson and Wiman.
One contract about the flour was drawn in part, and torn up.
Bronson said they had a communication from their agents at
New-York, and that there was a prospect of flour doing a little
better. Wiman wanted Bronson & Crocker to pay the expense
of inspection. Bronson said, he did not know any thing about
that. Wiman insisted on having it in the contract. Wiman
evinced a disposition to have it worded so as to leave it optional
with him to deliver 1000 or 2000 barrels. Bronson wanted it
for 2000 barrels. Wiman asked the witness if he had better
go it, or do it. The witness said to him, he knew his own busi-
ness best, and gave him no advice. Wiman said he should
make a dollar a barrel."

The plaintiffs' counsel then called as a witness, Joseph Re-
naud, who testified as follows, viz.: "I recollect the purchase of
flour from Mr. Wiman. I was then, and still am, clerk for the
plaintiffs. Wiman came into our office in the evening of the
16th of October. S. V. Fort, and myself, were there alone."
The plaintiff proposed to show, by this witness, the declarations
of the defendant made that evening in the plaintiffs' office, show-
ing that the defendant then knew what the steamer's news was,
and also what the information was which Crocker possessed, and
that, knowing that, the defendant said he was satisfied with this

contract; and also declarations showing that he re-affirmed the contract with such knowledge. The counsel for the defendant also objected to the admission of this parol evidence, on the ground that the plaintiffs were not present at the interview, and also that the bargain or contract could not be confirmed by parol. It should have been in writing. But the judge decided that the evidence of the declarations of the defendant, so offered, was admissible to go to the jury, and that, at all events, it was admissible as tending to show that the defendant was not deceived by the false representations of the plaintiff Crocker, and did not rely upon them in entering into the contract to sell the flour. To which decision and opinion the defendant did then and there duly except. The witness then testified as follows: " Wiman came in a little before seven o'clock in the evening, and Mr. Crocker came in five or six minutes afterwards. Nothing was said about the news. Wiman said to Crocker in a laughing way, 'why, Crocker, they say that you *have shaved me.*' Crocker said, he did not know. They conversed some time without my paying attention to what was said, till I heard Wiman say he was satisfied with his bargain, for he was sure of making one dollar a barrel, and Crocker was not sure of making any thing."

The plaintiffs then recalled said Sebastian V. Fort, who further testified as follows : " I was in the plaintiff's office on the evening of the sale of flour. About seven o'clock Wiman came in. I recollect the conversation between him and Mr. Crocker. Wiman came in laughing and said he had made one dollar a barrel on the flour, and hoped Crocker would make as much. He and Mr. Crocker were talking ten or fifteen minutes or longer. I do not remember the rest of the conversation. I recollect that Mr. Wiman said he was satisfied with the sale—that he had made a dollar a barrel." The plaintiff then called as a witness Philo Stephens, who testified as follows : " I was a miller here in 1845. I remember the time when the plaintiffs bought the flour of the defendant. The news of the arrival of the steamer was in town, and a good many knew it a little after twelve at noon of that day. The news was that there was an advance in

flour. The mail came a little after four o'clock in the afternoon, when the news became generally known. I got a letter which did not come by mail; it came by a boat, and was received about 4 o'clock P. M. It gave the news of the steamer; stated the advance on flour in the English market, and that expresses had been sent to Oswego, telling us to look out for them. There was a good deal of excitement among the millers in the village on the subject, and most all of the millers went to the packet boat on its arrival, in the afternoon, to learn the news. There I received my letter and read it to those that went with me, and the news was then generally known. It gave the news of the arrival of the steamer. The news was known and talked of by some of the millers after I got my letter. It was after dinner—after two o'clock that I knew Shepard of Troy was here, and sold some flour to him. After the mail came in that day, I talked with most of the millers about the news. It was a matter of excitement among us. I sold to Shepard for $5,25, delivered at Troy, just after dinner. This was after I heard there was news. I told Shepard he was too late, for there were others before him. I had no definite information. The fact of the sales to the plaintiffs made us suspect that there was news. This, with the arrival of strangers, made us think there was an advance. I showed my letter to several. It said there was news from the steamer of an advance in the English markets. I showed it in my office a little after 4 o'clock, P. M. The defendant was not there, and I do not remember seeing him that day."

The plaintiff then recalled said Dickinson, who testified—" I saw Wiman again sometime after; after I had made a trip with my vessel—I think some eight or ten days after I saw Wiman before. He hailed me, and asked me if I recollected the bargain made in his office, when I was there before. I related over the bargain as near as I recollected. He laughed a little, and said, ' I don't know but I am satisfied with it.' This was about all he said. The plaintiffs were not there, either of them."

The evidence being closed, his honor, the justice, charged the jury, among other things, as follows : 1. The first question was, whether the plaintiffs were ready and prepared to pay for the

flour on delivery. It was to be remembered that the flour was to be delivered to Wing in Albany, and that there was no certain time provided for its delivery. The evidence of Mr. Chipman was then read to the jury, and the question submitted to them whether there was evidence that the funds were ready. The judge *observing,* that if Wing had the money, he could easily have purchased a New-York draft, thus turning it into New-York funds to meet the contract. 2. The next question was, whether the plaintiffs were guilty of fraud in making the contract; and here the judge stated the principles which would govern them in their deliberations, and commented on the evidence. 3. The next question was, whether the defendant was deceived and defrauded, and entered into the contract relying on the representations of Mr. Crocker. For if he was *not defrauded,* but made the contract without reference to those representations, then the defendant ought not to succeed. And on this point the judge remarked, that ordinarily it would be enough to prove the fraudulent representations, and the inference would follow that the defendant was influenced by them. But in this case, it might not be so, and he proceeded to state and comment on the evidence, showing the difference between the cases in which such an inference would be an almost certain conclusion from the evidence, and this case—alluding to the defendant's declarations that evening on which the contract was made, to the effect that he was satisfied with the contract—that he was sure of making a dollar a barrel, and that Mr. Crocker was not sure of making any thing; and, on the whole, submitting to the jury, whether (admitting that Crocker's representations were fraudulent) Wiman gave credit to, and was influenced by them in making the contract. 4. The judge then submitted to the jury, whether (if they found the representations fraudulent, and that Wiman was influenced by them in making the contract) there was a re-affirmation of the contract afterwards, by Wiman, after a notice of the fraud. And on this point, among other things, the judge instructed the jury, that if they believed that Wiman, after receiving information of the arrival of the steamer, and the rise in the price of the flour, and that he had either knowledge, or fair no-

Bronson *v.* Wiman.

tice, or fair reason to believe that he had been deceived, then re-affirmed the contract, then he would be bound by such re-affirmance. For, by such re-affirmance, the plaintiffs would be bound to provide funds to pay for the flour in Albany, on its delivery there, which, if Wiman had at once disaffirmed the contract, then no such necessity would have existed; but they must be satisfied that Wiman intended to re-affirm it. The counsel for the defendant excepted to the first branch of the charge, upon the ground that there was no evidence that the plaintiffs were ready and prepared with New-York funds to pay for the flour. And to the last branch of the charge, for the reason that there was no evidence to show that Wiman, though he knew of the rise in the prices, was aware that Crocker had deceived him. To which the judge remarked, that the words used by Wiman were, "They say you have shaved me." And that after that it was a question for a jury. The judge then put to the jury these specific questions for them to answer in writing, as follows, viz.: "If you find in favor of the plaintiffs then you will state whether you find 1. That Crocker's representations were fraudulent. 2. If so, whether Wiman was actually deceived and induced to sell by means of such representations, or whether he sold independently of those representations, not influenced by them. 3. If you find that Wiman was actually deceived and defrauded, then whether he re-affirmed the contract afterwards with a knowledge or fair notice of the fraudulent character of these representations."

The jury rendered a general verdict for $1433,60, and a verdict in writing as follows, which was entered: "We say that the defendant was not deceived, but acted independently," which was attached by a wafer to and covered the second of the above questions, on the same paper which was delivered to them.

The defendant made a case, and moved for a new trial.

*H. A. Foster*, for the plaintiffs.

*D. H. Marsh*, for the defendant.

Bronson *v.* Wiman.

*By the Court,* GRIDLEY, P. J. This action was brought for the non-delivery of two thousand barrels of flour upon a contract, of which the following is a copy : "Mem. of an agreement between T. Wiman and Bronson & Crocker. I have sold Bronson & Crocker two thousand barrels superfine flour, to be delivered in Troy or Albany, as B. & C. shall direct, at four $\frac{84}{100}$ dollars per barrel. The charge for inspection, if any, to be paid by B. & C. This flour is to be the first 2000 barrels shipped from the mill after this date, and we, Bronson & Crocker, agree to receive the above flour, and pay for the same in New-York funds.          T. WIMAN.

                                   BRONSON & CROCKER,
*Oswego, Oct.* 16, 1845.                per E. T. Bronson."

On the 20th of October of the same year, Bronson & Crocker, by letter, directed the flour to be delivered at Albany to J. K. Wing, who, it was stated in the letter, would pay for the same ; and asked for information whether any flour had been shipped, and if not, how soon it would be. No answer having been received, on the 20th of November the plaintiffs addressed another letter to the defendant, reminding him of his contract, and demanding its performance, by a delivery of the flour to said Wing at Albany, who, the note stated, would pay for the same.

I. On the trial an exception was taken to the sufficiency of the proof of the contract. We think it was sufficiently proved in the first instance. But if there was any defect in the proof when the contract was read in evidence, it was supplied afterwards, by the testimony of the agent who executed it for the plaintiffs. (*See Hayden* v. *Palmer,* 2 *Hill,* 205 ; 6 *Cowen,* 484, 5, 490.)

II. After the plaintiffs had rested their cause, the defendant's counsel moved for a nonsuit, on the ground that the plaintiffs had not shown payment, or performance, or any tender of payment or performance, and also because they had not shown that they, or Wing, either had or could get New-York funds either at Albany or elsewhere. The judge denied the motion ; holding that there was evidence enough to be submitted to the jury. To this decision there was an exception, and the question on

this motion is, whether the ruling of the judge was correct. We hold the decision of the judge on the question of nonsuit right.

1. It is to be observed that by the terms of the contract the delivery of the flour was to be made in Troy or Albany, at the plaintiffs' election; and that they subsequently elected that the delivery should be made to Mr. Wing at Albany, and gave notice of their election to the defendant. Albany, then, was the *place* of delivery and the *place* of payment. As the flour was never delivered, nor offered, at Albany, or elsewhere, it is manifest that there could neither be payment nor tender of payment.

2. As to the proof of readiness and ability to pay in New-York funds, it will be borne in mind that the *time* of delivery was *uncertain;* and that in their letter of the 20th of October, the plaintiffs request to be notified of the shipment of the flour. This is clearly a different case from a contract where the *time* as well as the *place* is rendered uncertain by the terms of the contract. In the latter case it would behoove the purchaser to have on hand the funds with which to make payment; but were the plaintiffs bound to keep $10,000 of New-York funds on hand, to pay for the flour whenever it should arrive? Would not the facilities for raising this sum, whenever the flour should arrive, be all that a reasonable interpretation of the rule would require, especially when the defendant was assured, both in the letter of the 20th of October and in that of the 20th of November, that Mr. Wing would pay for the flour on delivery? and can a defendant who has violated his contract, and never made the experiment by an offer of the flour and a demand of the money, insist that proof of an ability to pay and of the possession of New-York funds during the whole succeeding fall, should be required of the plaintiffs? It seems to us that the very slightest evidence of an ability to pay for this flour, according to the contract, would satisfy the rule, which is admitted, as a general proposition, to be binding on the purchaser. The evidence, however, which the plaintiffs were able to give of their ability and readiness, was entirely sufficient to warrant its submission to the jury; even if the *time* as well as the *place* of delivery, had been designated in the contract. This evidence

may be viewed in two aspects. 1st. Whether there was suffi-cient evidence of an ability and readiness to pay for the flour in funds generally. 2d. Whether there was *any evidence* that New-York funds could be obtained.

(1.) Upon the first branch of this question the case of *Coonley* v. *Anderson*, (1 *Hill*, 520,) is a decisive authority. This was an action to recover damages for the non-delivery of a crop of barley by the first of November, 1835. A clerk of the plaintiffs testified on his direct examination, in general, "that the plain-tiff was ready and willing to receive and pay for the barley all that fall;" but on his cross-examination he admitted "that he did not know whether the plaintiff had any money to pay for the defendant's barley on the first day of November, but knew that he had money to pay for barley about that time; yet he could not state that he had any money for that purpose on that day, different from any other day." After this, several distinct questions were put to him by the plaintiff's counsel, which were overruled, and the plaintiff was nonsuited. This nonsuit was set aside by the supreme court, and an elaborate opinion was delivered by Judge Bronson in support of that decision. The learned justice says, that in his judgment *enough was proved by the clerk* to carry the cause to the jury; and at all events the specific questions which were overruled should have been allowed to be put. Among those questions were the following : "Was the plaintiff buying barley during all the months of October and November in that year? Can you say he had sufficient money about the first of November? Was the plain-tiff desirous of buying barley at five shillings per bushel?" The judge then proceeds to say that it seemed to have been supposed that the plaintiff was bound to make out his averment by *direct proof*, but that was an erroneous opinion. Presumptive evidence was enough; and evidence that the plaintiff was purchasing barley—and that he had either in possession or *at his command at the shortest notice*, such sums of money as showed his ability to fulfill his contract, would be sufficient. Now in the light of this luminous exposition of the law on this point, let us look at the evidence of an ability to pay for this flour, in the case under

consideration. It appeared in evidence that the flour was pur-
chased, and was owned in equal proportions by Bronson &
Crocker, Tomlinson, and J. K. Wing of Albany. The flour was
worth more than the contract price. The witness Chipman was
a clerk of Mr. Wing, who had written the letter to Tomlinson
desiring him to purchase flour at five dollars per barrel. Chip-
man when examined on this point, testified as follows : " We
had been advised of this contract, and I had a copy of it. We
were prepared *to pay for this flour whenever received.*" On
his cross-examination he said, "the paper *purported* to be a
copy of this contract. I am sure of its being a copy since I
have heard this read. I don't know whether the *plaintiffs* had
funds in Albany or not. I was clerk in Mr. Wing's establish-
ment. *I know that every demand against Wing was paid
at that time promptly;* and that he was preparing to pay for
this flour if it arrived. I know that, because I heard him say
so. *Mr. Wing had facilities for raising money to any
amount he pleased, sufficient to pay for* 2000 *barrels of flour.*"
Here, then, was an advantageous contract ; a wholesale flour-
dealer, who had facilities for raising any sum he pleased ; who
was interested to one-third in the contract ; who paid any de-
mand promptly at the time ; and who had received advices of
this contract, and had been preparing to meet it—and the ques-
tion is, whether there was *any evidence* to submit to a jury of
an ability and readiness to pay ! He who can seriously question
this, can not agree with the learned judge who gave the opinion,
in *Coonley* v. *Anderson;* for the evidence in this case is im-
mensely stronger than in that ; and yet in that case the nonsuit
was set aside.

(2.) Upon the second branch of this objection, viz. that there
was no evidence that Mr. Wing could procure New-York funds
in which the payment was to be made by the contract, I will add
a few words. The first branch of the charge was excepted to on
the same ground, and the judge remarked in reply to this objec-
tion, that if Mr. Wing had the money he could easily have pur-
chased a draft on New-York. I should have supposed that the
court might be presumed to be acquainted with the common and

ordinary modes of transacting commercial business, had not the opposite doctrine been so strenuously asserted on the argument. It is. laid down in Chitty on Pleadings, that the courts will take notice of the division of the country into counties, and of what counties are incorporated, &c. We know, therefore, that there is such a city *as* New-York, and such a place as Albany. We also are charged with an acquaintance with all the public statutes establishing banks, in New-York and Albany, and regulating the business of banks; one branch of which is dealing in exchange. We may also be presumed to know the several statutes prescribing the rates of exchange between this state and the several other states of the union, and it is a fair presumption that the rate of exchange between Albany and New-York (both places being within the state) would be less than between a place in this state and a place in a foreign state. It will follow that the advance to be paid for New-York funds will not be so great as to put it beyond the power of a party who has contracted to pay in New-York funds, to obtain them in the city of Albany. Independently of this, a knowledge of the ordinary business of the state is constantly assumed by the courts. For these reasons we see no error in the refusal to nonsuit the plaintiff.

III. The letter from Wing to Tomlinson contained all the news which Crocker had of the steamer. And as his representations were charged to be fraudulent, on the ground of the possession of news of the steamer, it is very clear that the letter was competent testimony. It was offered, and received by the court, as evidence of a negative character, showing that Crocker could not have had so much knowledge of the market as the other evidence tended to prove. In that view it was competent evidence. It would show with precision, the whole information, and in the most reliable manner, which either Tomlinson or Crocker possessed; and would prevent all conjecture as to the contents of the letter, and all speculation as to Tomlinson being mistaken and Crocker having actually seen the letter before his interview with Wiman. The character of the letter produced by V. Suydam would lead to conclusions which rendered the admission of the letter in question but an act of justice to Mr. Crocker.

IV. In the progress of the trial, and after an attempt had been made to prove that the contract had been procured by fraudulent representations, the plaintiff offered evidence to show that after the defendant had become acquainted with all the facts of the case, he declared himself satisfied, and reaffirmed the contract. This evidence was objected to, on the ground, 1st. That the plaintiffs were not present; and 2d. That the bargain could not be confirmed by parol. The first objection was not founded in fact; for the declaration was made to Mr. Crocker himself. The second objection is untenable for two reasons. It was obviously founded on the idea that the contract was within the third section of the statute of frauds. (2 *R. S.* 136.) This section respects the sale of goods exceeding the amount of fifty dollars in price, and among other things declares the sale void, except it be in writing. Now it will be remembered that this was a contract to deliver 2000 barrels of flour, to be ground out of wheat that had been bargained for, but not received by the defendant. This appears from the testimony of the witness White. This is like an agreement for the sale of wheat which, at the time of the contract, was not threshed, (*Alexander* v. *Comber*, 1 *H. Black.* 20,) or a contract for oak pins to be made out of slabs. (3 *Maule & Sel.* 178.) Such contracts are not within the statute. (7 *Term Rep.* 16. 18 *John.* 58.) But there is another reason which is fatal to this objection; and that is that the question is not one of variance or alteration of a contract, as was the case of *Sanford* v. *Halsey*, (2 *Denio*, 242, 3,) but a case of simple affirmation of a contract which was supposed to be voidable. We will suppose, therefore, for the sake of the argument, that in this respect the case at bar resembles the contract of an infant, which requires confirmation. A note or deed of an infant may be confirmed by any decisive act, as a promise to pay it, and sometimes by simple acquiescence. (2 *Kent's Com.* 238, 9. 11 *Serg. & Rawle*, 305. 1 *Hayw.* 143. *Hubbard* v. *Cummings*, 1 *Greenl.* 11.) These are all the grounds of objection to the introduction of the evidence, which were mentioned at the time it was offered.

V. An exception was taken to the first branch of the charge,

Bronson *v.* Wiman.

which has been already considered under the second point. There was also an exception to the last branch of the charge, in which the judge instructed the jury as follows, in regard to the reaffimation of the contract. " That if they believed that Wiman, after receiving information of the arrival of the steamer, and of the rise in the price of flour, and that he had either knowledge or fair notice or reason to believe that he had been 'deceived, *then reaffirmed the contract,* he would be bound by such *reaffirmation;* for by such reaffirmance the plaintiffs would be bound to provide funds to pay for the flour in Albany, on its delivery there; whereas if Wiman had at once disaffirmed the contract, then no such necessity would have existed. But they must be satisfied that Wiman *intended to reaffirm it.* To this branch of the charge the defendant excepted "for the reason that there was no evidence to show that Wiman, though he knew of the rise in prices, was aware that Crocker had deceived him." To which the judge remarked that the words used by Wiman were, " They say you have *shaved* me;" and that after that it was a question for the jury.

Now it is true there is no *direct* and *positive* evidence that Wiman knew he had been *deceived,* except his own declarations; but there were circumstances from which it might be presumed. From the evidence of Philo Stevens it can hardly be doubted that the fact of Tomlinson's visit to Crocker, of Crocker's large purchases from others, and of the fact that Tomlinson brought news of some kind, was known to Wiman, and every other miller in the Oswego market, some hours before seven o'clock in the evening, when the interview between Crocker and Wiman took place. But the word " *shaved*" is to be understood in its offensive sense, and is equivalent to saying " You have *deceived* me, you have *defrauded* me, or you have *overreached* me by fraud." Suppose however the word was equivocal, and might be understood in an innocent sense; then it was for the jury to say in what sense it was used. (*Dolloway* v. *Turrill,* 26 *Wend.* 383. 6 *Barb.* 47, *and cases there cited.*)

Here the case ends. The jury have determined every other question; and there was no objection to the submission of those

questions to the jury; nor to the manner in which they were submitted. But other questions have been argued, and it may be well to consider them.

1st. It is *said*—but no authority has been furnished us to support it—that the same rule prevails in the case of the affirmation of a contract voidable for fraud, as that which obtains in the case of the confirmation of an infant's contract. But the case of an infant stands on ground peculiar to itself. As a general rule, an infant must reaffirm the contract, expressly, by a promise made to the other party, or his agent. (2 *Kent's Com.* 238. 19 *Wend.* 301. 2 *Barn. & Cress.* 824. 4 *Wend.* 405.) Now did not the evidence in the case under consideration come up to this? Let us see. The witness Renaud testifies that Wiman said to Crocker, "Why Crocker, they say you have shaved me." Crocker said he "did not know." That they conversed some time without the witness paying attention to what was said, till he heard Wiman say "he was satisfied with the bargain; for he was sure of making one dollar a barrel, and Crocker was not sure of making any thing." This was nothing more nor less than an explicit ratification of the contract. "I am satisfied with my bargain," notwithstanding you have shaved or deceived me. Why was he satisfied? He gives us the best of reasons, in the next sentence—"*for* I have purchased my wheat at such prices that I am sure of making a dollar on every barrel of flour; and with a certainty of making $2000 I am satisfied. And you are not certain of making any thing. True by the present news, the flour is worth a small advance on the barrel; but the next arrival may show a fall of more than that sum per barrel. I have $2000 clear profit in my hands. You have an *expectation* of an advance, which may vanish with the news from the next steamer." Such is the language of the defendant, and we think it entirely clear, certain and unequivocal. How could he be sure of making $2000 unless the contract was affirmed? And how could he say that Crocker was not sure of making any thing, unless with reference to the contract? and how could he say he was *satisfied* with his bargain unless he affirmed it?

2d. But we do not assent to the doctrine, that the case is to

be assimulated to that of an infant. Whenever one has been defrauded he may rescind or affirm the bargain; but if he rescinds, he must so do *promptly ;* as soon as he discovers the fraud. And this, whether the contract be executed or executory. (*Chit. on Cont. Am. ed. of* 1842, *p.* 608, 9, 680.) The same great principle of good faith requires the defendant to speak promptly in the one case, as in the other. If he does not disaffirm the contract, then the plaintiffs are obliged to make arrangements for raising $10,000 of New-York funds, and they may forbear to purchase other flour, relying on this contract already made. But in this case the defendant did more : he expressly, in the most unequivocal terms, reaffirmed the bargain. And he is estopped from disaffirming the contract by the principle of estoppel *in pais.* (6 *Hill,* 534. 3 *Id.* 215. 4 *Metc.* 381. 18 *Conn. R.* 138. 9 *Barn. & Cress.* 509, 57.) See, also, on the question of re-affirming a contract, 1 *Adol. & Ellis,* 40 ; 1 *Denio,* 69 ; 4 *Id.* 559 ; 9 *Barn. & Cress.* 59 ; 5 *Mee. & Wels.* 83 ; 4 *Mass. Rep.* 502 ; 24 *Wend.* 76 ; 4 *Paige,* 541. 12 *Pick.* 311.

Why should a different rule be adopted in relation to a contract which a party is at liberty to abandon on the ground of fraud, than is applied in other cases ? The answer is, that it is extremely improbable that a man who has been defrauded would affirm a contract from which the law absolves him. And we are referred to the case of *Moore* v. *Royal,* (11 *Ves.* 373,) for the rule. In that case, the lord chancellor says the improbability is so great, that the party would have affirmed his contract, that it requires strong evidence to establish it. The fact is otherwise here. In this case it was an act of prudence in Wiman to affirm the contract, and make his $2000. The case of *Moore* v. *Royal,* however, does not declare the rule to be the same with that which prevails in the case of infants ; nor does it attempt to prescribe the character of the evidence required to establish the affirmance of a contract. In the case of an instrument that is proved to be forged, its adoption by the party sought to be charged, may be proved by any competent evidence that shows the fact of *adoption.* The case of forgery is much

Bronson *v.* Wiman.

stronger than a case of fraud. In the one case the instrument is a *nullity :* in the other, it is merely *voidable.* Whatever, therefore, would affirm a forged instrument, *a fortiori* would be sufficient to affirm a beneficial contract, though it were tainted with fraud. (*Phillips* v. *Ford,* 9 *Pick.* 39.) So a debt barred by the statute of limitations may be revived by a new promise, or by any facts from which such promise may be inferred. So, too, a debt that has been discharged by an insolvent or bankrupt law, may be restored by a promise less strong than that proved in this case. But,

3d. The jury did not, probably, come to the question of a confirmation of the contract. By looking at the case, it will be seen that after the jury were charged, the judge, with a view to know the ground on which the verdict was based, put three specific questions to the jury, in writing, and without objection: *First,* whether Crocker's representations were *fraudulent. Second,* if so, whether Wiman was *actually* deceived by means of such representations, or whether he sold independently of those representations, not influenced by them. And, *thirdly,* whether the contract was reaffirmed. The jury found *a general verdict,* which they placed on the ground that they found the second of the said questions in favor of the plaintiff. Of course they found against the fraud ; that is, that Wiman was not deceived, but acted independently of the representations made to him. It follows that the question of the reaffirmation of the contract is out of the case.

The motion for a new trial must be denied.