SILAS Q. PERRY

v.

JAMES H. PEARSON ET AL.

*Sales—Corporate Stock—Fraud—Rescission—Bill for Relief—Ratifi-
cation.*

Upon a bill for rescission, or for an accounting for stock of a corporation
sold by the complainant to one of the defendants under circumstances alleged
to have been fraudulent and oppressive, this court, reviewing the evidence,
holds that the complainant, with full knowledge of the facts and all his
rights, ratified the sale of such stock, and that he can not now complain
thereof, upon a bill for relief in the nature of an accounting.

[Opinion filed March 13, 1889.]

APPEAL from the Superior Court of Cook County; the Hon. HENRY M. SHEPARD, Judge, presiding.

Mr. THOMAS DENT, for appellant.

Messrs. W. W. FARWELL and JOHN N. JEWETT, for appellees.

GARY, J. This is a very voluminous case, but the principle upon which it must be decided is a very short one. It is that the appellant, with full knowledge of all the facts and of all his rights, has ratified the contract which he made with appellee Pearson, of which he now complains.

In December, 1882, the appellant and the Pearsons formed a corporation in Michigan, called the Perry-Pearson Company, to conduct a lumber business. They were the sole original stockholders. The capital, $650,000, was divided, $360,000 to Perry, for which he paid by putting in property valued at more than $500,000, on which the new company assumed an indebtedness of more than $150,000; and the Pearsons took $290,000, for which they paid by putting in about $190,000 in property, and undertaking to supply working capital of about $100,000. The company did a losing business for two years. Perry was the manager and holder of the majority of the stock, but had no other resources. Toward the end of the first year the company was compelled to have more money, and a mortgage of a large part of its property was made to the Pearsons to indemnify them for becoming sureties for borrowed money. In the fall of 1884 the outlook was bad. Efforts were made to get a new man, with capital, into the company, but they failed, and negotiations commenced for the purchase by the Pearsons of Perry's interest in the company, which resulted in the sale by him to them of his interest for $31,500 in property. The appellant complains that the Pearsons oppressively used the power which the mortgage gave them; that they muttered threats that unless he accepted the terms they offered he would get nothing; that they made a pretense of offering their stock free to anybody who would

indemnify them against the debts of the company, with the purpose that the appellant should learn of such offers, and put a low estimate upon his .stock; that the younger Pearson made a false representation as to the quantity of timber on the lands of the company; and that during all the time of the negotiations he was in such bad health and mental distress as disqualified him for the conduct of business with his ordinary ability.

There are two sides to the story upon. which his complaints are founded.    As a principle of law, it is undoubtedly .true that the parties owed to each other the utmost good faith. 2 Lindley on Part. 569, and thirty pages following; Thompson v. Meisser, 108 Ill. 359.    And that the position of the Pearsons as mortgagees exposed them to the jealous watchfulness of courts.    Jones on Mortgages, Sec. .711; Brown v. Gaffney, 28 Ill. 149.

And yet if the company was fast going to wreck, on the verge of· insolvency and a total loss of all assets, the appellant could base no title to relief against the appellees upon the fact, assumed or real, that they had resources outside, and he had not, by which the business of the company might be kept going.    Nor is it easy to say that even generosity would require them, or that it was consistent with their own safety, to put more money into the losing business of a company from the direction of which, at the next election of a board, they might be wholly excluded by the vote of the appellant, as holder of a majority of the stock.

The plausibility of the appellant's demands, and the impulsive feeling that he ought to have some redress, spring less from the evidence of what took place between the parties in the fall of 1884 than from a consideration of the great profit which the Pearsons made by disposing of the property in January, 1886, when they got a net sum of about $300,000 out of it.    Every fact, however, that touches the claim for relief, because of misconduct by the Pearsons, was as well known to the appellant the day he made the sale to them as on the day he filed the bill.    In that sale they assumed a very large indebtedness, part of which was his private indebtedness before the formation of the company, and upon another part

of which he was personally liable, the two classes together amounting to about $80,000. He took from them a bond to indemnify him against those debts. He says that in March, 1885, he began to consider the question of suing the appellees, and in April he had made up his mind to do so, unless justice was done him. Yet he said nothing to either appellee, though he consulted counsel, until, in the following summer, by inquiring both at the bank and of James H. Pearson, he found that his debts, which appellees had assumed, they had paid. But even then he made no demand for a rescission. His own testimony describes a stormy interview in which he demanded back his property, or a portion of it, but made no offer to do anything himself further than to say, in reply to Pearson's question whether he wanted to pay the notes of Perry, that Pearson had paid ; that he would pay them if Pearson would give him up his property. And this was idle talk, for he had nothing, and had made no arrangements with anybody for anything with which to pay.

In the trade, James H. Pearson conveyed to appellant the house in which he resided. From November 15, 1884, to May 1, 1885, James H. Pearson paid appellant rent therefor at $75 per month. April 4, 1885, appellant made to Pearson a new lease for the house, the rent being $1,000 for the year ending May 1, 1886, $175 May 1, 1885, and $75 the first day of each month thereafter.

There is more in this conduct of the appellant than mere *laches* or acquiescence. It amounts to a positive ratification of the sale by him. Each receipt of rent of the house, month by month, was a repetition of a representation that each was dealing with his own.

Standing by, observant of the appellees carrying and discharging the obligations they had assumed for his deliverance from debt, gaining his freedom by their efforts and at their expense, estops him from questioning the validity of the contract, to perform which, if they needed his encouragement, he gave it abundantly. Bigelow on Estop. 475–6, and the case of Bronson v. Wiman, 8 N. Y. 182, and 10 Barb. 406, where the facts are stated, with an excellent opinion.

It is rather vaguely stated in the brief on behalf of appellant that this suit is for a share of the profits the appellees have made. No authority is cited that a vendor can call a vendee to account for profits, where, if the parties could be placed in *statu quo*, he could not demand a rescission. An account for profits would be upon the theory that the appellees had made profits from the property of appellant. It could be his own only upon the ground that the sale was voidable, and he had elected to avoid it. The decree of the Superior Court dismissing the bill is affirmed.

*Decree affirmed.*