No. 35,871

E. E. Fox and Carl Kobler, *Appellees*, v. The Kansas Farmers' Union Royalty Company, of Salina, et al., *Appellants*.

(139 P. 2d 815)

Opinion filed July 10, 1943.

C. W. Burch, B. I. Litowich, LaRue Royce, L. E. Clevenger and E. S. Hampton, all of Salina, were on the briefs for the appellants.

*W. L. Sayers* and *Wendell P. Sayers,* both of Hill City, were on the briefs for the appellees.

The opinion of the court was delivered by

HOCH, J.: This was an action by two stockholders of a corporation, on their own behalf and on behalf of "all other persons whose rights are similarly affected" to enjoin the officers of the corporation from distributing a declared dividend to certain classes of stockholders, and for a declaratory judgment determining a controversy as to the right of such stockholders to vote their stock. The trial court held for plaintiffs in some particulars and for defendants in others. Appeal and cross-appeal followed. The issues presented will more clearly appear in connection with recital of the facts and findings of the trial court.

The defendant corporation was the Kansas Farmers' Union Royalty Company—hereinafter referred to as the company—which has several times been a party to appeals to this court. (*Gates v. Kansas Farmers' Union Royalty Co.,* 153 Kan. 459, 111 P. 2d 1098; *Hushaw v. Kansas Farmers' Union Royalty Co.,* 149 Kan. 64, 86 P. 2d 559; *Shaffer v. Kansas Farmers' Union Royalty Co.,* 146 Kan. 84, 69 P. 2d 4.) Appeals were also taken to the United States supreme court, which declined to take jurisdiction on the general ground that no substantial federal question was involved.

The plaintiffs, E. E. Fox and Carl Kobler, residents of Graham county, are each the owner of four shares of stock in the company. For present purposes it is unnecessary to note the other parties defendant. There being both an appeal and cross-appeal, we shall refer to parties as plaintiffs and defendant.

Brief statement of facts will suffice. In the opinions in the cases cited, *supra,* may be found more complete recital concerning the company and its operations.

The company was granted a charter in 1929. The corporate purposes were stated in the charter to be:

"(a) The purchasing, owning, pooling and disposing of mineral rights and royalties and royalty interests in minerals, of all kinds, including oil and gas, in real property situate in the State of Kansas and elsewhere, and the leasing of lands for exploration and development for the production of minerals of all kinds, including oil and gas, and the selling and disposing of the minerals produced.

"(b) The purchasing, owning, holding, selling, leasing and incumbering of any and all real and personal property of every kind and nature necessary or convenient in the conduct of its business.

"(c) To operate mines, oil wells, gas wells, production and refining plants and to sell and dispose of the products therefrom, including any and all products of petroleum and natural gas.

"(d) To do any and all things incident to or connected with its business in the exercise of its corporate powers as may be now or hereafter authorized by law."

The authorized capital stock was 2,229 shares of one dollar each. The company filed its application under the speculative securities act, commonly called "blue-sky law" (G. S. 1935 and 1941 Supp., ch. 17, art. 12), for permission to sell its stock in Kansas on the basis of one share in exchange for a mineral deed conveying an undivided one-half interest in the mineral rights in a quarter section of land. Permit for such sale was issued on November 13, 1929.

We are not here concerned as to the number of shares issued. It is agreed that on February 1, 1942, there were 746 shares outstanding, as shown by the company's books.

The coöperative plan upon which the company was based was that by pooling one-half their mineral rights—meaning oil and gas—in their land wherever located in Kansas, landowners would thereby share equally in oil and gas returns from all the land and the chance of some return by every individual landowner be thereby enhanced. It was agreed by all subscribers to stock that the company should retain three-fourths of the one-half interest in mineral rights conveyed to it and the other one-fourth should go to the promoter. It was represented that only members of the Kansas Farmers' Union would be eligible to become stockholders, though the instant company is a separate corporation.

It is unnecessary to set out in full the provisions of the mineral deeds. Provisions pertinent to the instant issue, in addition to what has already been stated, were as follows:

"Said land being now under an oil and gas lease, executed in favor of/as to record, it is understood and agreed that this sale is made subject to the terms of said lease and covers and includes one-half of all of the oil royalty, and gas rental or royalty due and to be paid under the terms of said lease insofar as it covers the lands above described. . . .

"To have and to hold the above described property . . . for a period of fifty years and as long thereafter as oil and gas may be produced therefrom; *and we do hereby bind ourselves* and our heirs, executors and administrators *to warrant and forever defend* all and singular the said property unto the said grantees herein, their respective successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

"It is hereby further expressly agreed that *the grantees accept this conveyance subject to any mortgage loan now existing against the above described*

*land or any renewal thereof on the same,* or on new, modified or qualified terms and conditions; and that *this grant of mineral and royalty rights shall at all times be subject to, inferior and subordinate to any future mortgage loan which may be applied for and placed on the land by the grantor herein,* and the same shall have the same force, effect, validity and priority as if executed, delivered and recorded prior to the date of execution, delivery and recording of this mineral grant." (Italics supplied.)

The petition is quite lengthy and much of it need not be noted. In addition to what has already been recited we shall only summarize the averments sufficiently to disclose the issues. It was averred that the company was organized for the purpose of enabling landowners to conduct a coöperative pooling enterprise in mineral rights; that the charter did not prescribe qualifications for holding stock or restrict the right to transfer the stock to persons who were not landowners; that the plan was to issue one share of stock in return for a mineral deed conveying an undivided one-half interest in the mineral rights in 160 acres of land; that all deeds were made on the same printed form furnished by the company; that in the campaign to exchange its stock and build up the land pool agents of the company urged the idea of benefits to be derived from spreading over a large area the individual's chance of sharing in rentals and royalties; that a dividend of $2.50 a share had been declared by the company and a resolution adopted that this dividend should be paid to all stockholders of record; that the stock then held by some of the holders of record is void for the reason that the consideration for which it was issued has wholly failed; that such stockholders are not entitled to receive dividends or to vote upon a pending proposal for dissolution of the company, and that the rights of petitioners and others similarly situated would be injuriously affected if such stockholders were permitted to do so.

We come to the gist of plaintiffs' contention. In the petition they listed four classes of stockholders which they contended should be denied the right to share in dividends or to vote their stock. Roughly outlined these classes were:

*Class One.* Where the original mineral deeds became void because not recorded or listed for taxation, as required by G. S. 1935, 79-420, and where the original stockholders still hold the stock and own the land covered by the mineral deeds.

*Class Two.* Where the deeds became void under 79-420 and where the original stockholders still hold the stock but have conveyed the land to third parties "without notice of said mineral deed."

*Class Three.* Where the mineral deeds became void under 79-420 and where the lands are still owned by the original stockholders but the stock has been "sold or hypothecated to innocent third parties."

*Class Four.* Where the mineral rights originally received by the company have been entirely cut off as a result of foreclosure of mortgages executed by the landowners who received the stock.

In the case of two or three individual stockholders named defendants in the petition there was some refinement of facts alleged, but in view of the conclusions presently to be stated it is unnecessary to go into those particular cases. About 250 shares of stock are said to be included in the four classes enumerated.

In their answer the defendants admitted in large part the allegations of fact contained in the petition. They disclaimed any knowledge as to what number of shares there might be in the various classes described and averred that the company's books do not show what shares come within the conditions described. They further averred that as directors they had no power to determine the ownership or validity of the stock but are required to pay the dividend to all stockholders of record; that they had no knowledge as to whether a majority of the stockholders desired to submit a proposition to dissolve the company—as alleged in the petition—and that no official action on such a matter had been taken by the board. They asked that the court determine "the rights of the respective parties and of other stockholders similarly situated."

Answer of one or two individual stockholders and other pleadings need not be noted, except a motion by plaintiffs for "an order determining issues of law in advance of trial" in which they asked that an order be made holding ineligible to receive dividends all stockholders in the four classes, and that a commissioner be appointed to take evidence to determine "what shares of capital stock are valid and what shares are invalid, and other facts, and that the shares of stock that shall be found to be invalid, be canceled. . . ." The record does not disclose that any direct action was taken upon the motion.

The trial court filed a "Memorandum Opinion" and "Supplemental Findings and Conclusions." The rather complicated factual situations relating to the different classes of stock involved were painstakingly analyzed and the reasons stated for the court's conclusions. In view of the fact that this appeal is being disposed of

upon a comparatively narrow issue we shall quote only a few passages and shall not set out in full the findings and conclusions of the trial court. It may fairly be said, we think, that the court attempted to rest its determination of the issues primarily upon the persuasive proposition that no stockholder should be permitted to share in dividends or to vote his stock if the consideration for which his stock was given had failed and was no longer represented in the pool of mineral rights held by the company—unless it appeared that such stockholder had bought his stock without notice of such situation. This generalization is only to be regarded as a general comment and not one reflecting variances in particular situations considered by the trial court. In harmony with this general view the court held that stockholders in classes one and two, *supra*, were not entitled to corporation benefits or privileges and that the injunction should issue. As to these classes the court said in part:

"Leaving out the question of the wherefores of the failure to record the mineral deeds under 'Class I,' the mere fact that they were not recorded makes them void; and it seems that there should be no difficulty in arriving at the correct decision on what disposition should be made of this stock. Since the corporation took nothing and the shareholder parted with nothing, and since the shares of stock are still in the hands of the shareholders, and since said shareholders are still claiming the right to dividends and the right to vote said stock, it is perfectly clear that an actual controversy exists here and that the court has jurisdiction to determine the question of their rights insofar as they may vote the stock of the corporation or receive benefits thereunder in the way of dividends is concerned.

"Therefore, the court holds it would be inequitable to permit them to exercise such voting rights or rights to receive benefits unless and until they have made proper and legal conveyances to the corporation of the lands involved. . . . The corporation should again make demands upon the holders of such stock for the conveyances. . . . All stockholders who have failed to comply with such demands and make proper conveyances or who have failed to surrender their stock for cancellation within thirty days after such demand should be and they are barred from receiving any dividends or benefits on said stock. . . .

"The findings of the court with reference to the stock included in 'Class No. 1,' has equal application to the stock issued in the so-called 'Class No. 2' cases. The corporation received nothing; the landowner parted with nothing. But, if the shareholder desires the benefits under said stock, he should be given an equal opportunity with those listed in 'Class No. 1' to make suitable conveyances and he should be given like notice."

As to class three the court said:

"Under these certificates, the same general rule applies. The company received nothing; the landowner parted with nothing. But the certificate of

stock has been issued and delivered and has gone into the channels of business and in the words of the pleadings the rights of 'innocent third parties' are affected.

"Therefore, we will have to assume that such parties are innocent purchasers without notice. While the court doubts, as a matter of law, that there could be any such thing as innocent third parties under such a state of facts, we will have to take the pleadings on their face as an admission that such parties are innocent third parties. We will have to assume that they have taken such stock without notice of any lack of validity. . . .

"Therefore, as to this class of stock, the court is of the opinion that it would be improper to enjoin the corporation or its officers with reference to the payment of dividends upon such stock or to interfere in any way or manner with the voting of such stock. The matter of damages to the corporation by reason thereof is a personal matter between the corporation and its shareholders over which this court is taking no jurisdiction at this time."

As to class four the court said:

"The plaintiffs in this case seek to prevent the participation of those referred to in the classification last above-mentioned by reason of the fact that the lands pooled to the corporation have since been lost by foreclosure and the stockholder is still the owner of the stock. These lands were received regardless of the encumbrance. It was contemplated, as shown by the deed itself, that it was expected that said mortgages would from time to time be renewed. It was also contemplated that unpledged lands might in the future be mortgaged and permission was given in the instrument to carry out any refinancing that might be necessary by the shareholder. . . .

"The defendant corporation undoubtedly has received many benefits in the way of bonuses and rentals from the lands coming within this classification and the court is unable to measure the benefits that the defendant corporation might have received; and that the defendant corporation has received such benefits is disclosed by the pleadings with reference to the one particular shareholder referred to herein, to wit, Shafer. . . .

"The defendant corporation was charged with notice of the mortgage upon the property, as a matter of law, at the time they took the conveyance  They had a perfect right to protect their interest therein in case of foreclosure. Having failed to do so, this suit does not bring the shareholder within the jurisdiction of the court for the purpose of determining any dereliction of his duty and this court could not assess any damages and, after all, the failure to keep the title good under the warranty contained was a personal one between the corporation on the one hand, and the stockholder, upon the other, which could not be determined here under the issues, under the declaratory judgment law.

"Therefore, the court cannot say, as a matter of law, that the owners of stock in this classification have no title thereto and are not entitled to any benefits in the way of dividends and the court refuses to enjoin the defendant corporation or its officers from paying such dividends to those owners of stock included in this classification."

In supplemental findings the trial court modified its findings as to class four to the extent that where the record disclosed that no bene-

fits of any sort had flowed to the company prior to foreclosure of the mortgages the same rule should be applied as in class one cases and all rights held to be forfeited. There were also findings as to two individual stockholders but they need not be noted.

While the judgment followed in most part the "findings" and "conclusions" there are some important particulars in which they do not conform. We note two such instances. In the memorandum opinion it was said:

"This court is in doubt as to its jurisdiction or its right to take any action that would seek to determine the individual interests of each shareholder in said corporation under the declaratory judgment law, unless and until they have been particularly brought within the jurisdiction of the court for the determination of their interests. . . . *It is not the intention* of the court in this memorandum opinion under the declaratory judgment law *to in any wise determine the individual rights or liabilities of shareholders who are not made parties* to this litigation insofar as their rights and ownership may be concerned, except their rights to receive dividends." (Italics supplied.)

In the judgment, however, the rights of individual stockholders who were not parties were determined and the corporation enjoined from paying dividends or "from recognizing any rights which the owners of any such stock may claim to have."

Again, we are unable to reconcile the "conclusions" and the judgment as to class three. As heretofore noted, the court refused to enjoin in this class on the ground that the stockholders were "innocent purchasers" who took their stock "without notice of any lack of validity." But in the judgment the theory of "innocent purchasers" was apparently abandoned and the corporation was specifically directed to recognize the rights of stockholders in class three in all cases where "the stock had been sold or hypothecated to third parties." Thus, the stock in the hands of "third parties" would be fully recognized even though "consideration" had failed and even though such present holders took with notice of "lack of validity." This may not have been the intention but that is the way the judgment stands.

What has just been said is not intended to be critical. But it illustrates the cloudy situation presented by the pleadings with which the trial court was attempting to deal. With no factual basis for dealing with individual shares of stock and dealing largely in abstractions, the court was seeking to correct a bad situation. With that purpose we can express hearty sympathy. But even if the directors were able to apply the generalizations of the judgment to

individual stockholders—and it is not apparent how they could do so in many instances upon any facts disclosed by the record or shown to be available—we would still be unable to harmonize the order enjoining or directing action by the officers and directors with the findings and conclusions which were incorporated into the journal entry of judgment.

In view of our conclusions, presently to be stated, it would be fruitless to pursue many of the questions involved. Did the court have power to determine the rights of individual stockholders not parties to the action? The trial court said no, but proceeded to enter judgment attempting to do so. Can an action be maintained by one stockholder in his own name to cancel the stock regularly issued, of another stockholder, or must such an action be brought by the corporation or in its name? When there is consideration for stock, when issued, can the stock be canceled for subsequent failure of value when such failure resulted from acts or failure to act of the corporation itself? Can there be any such thing as "an innocent purchaser for value" of a nonnegotiable instrument? Many such questions would require answer if they were reached. But we think that an initial question which arises at the very threshold of inquiry determines the appeal.

How can the plaintiffs or other stockholders so situated be heard to complain about the situation that has developed? It is perfectly evident that *chance* and not *equality* was the dominating idea in the whole scheme around which the company was built. It cannot be said, perhaps, that the company did not get some consideration for every share of stock exchanged for a mineral deed, but obviously considerations were not equal. Every quarter section of land was treated the same, regardless of where located—whether close to or far from oil or gas production. Also, regardless of its geology in relation to mineral prospects and regardless of whether encumbered by mortgage liens. Nor is that all. Not only was no account taken of mortgage liens existing when the stock was issued, but every mineral deed contained the amazing provision that the owner might thereafter freely mortgage his land and if he did so the mortgage would be senior to the mineral deed to the same extent as though executed and recorded prior to the deed. In other words, the landowner, after granting mineral rights to the company might thereafter reduce or in effect wipe out entirely the considera-' tion for his stock and yet still retain the stock—leaving only to the

company the uncertain remedies of redemption or of action against the stockholder on a warranty clause which has doubtful force in view of other recitals in the deed. We do not say that fraud was contemplated and no fraud is in fact charged in the instant action, but we do remark, in passing, that it is surprising that permit for sale of stock, under conditions so charged with possibility of fraud, was ever issued. But the trouble is that all of this lay in full view when stock subscriptions were made and when the mineral deeds were executed. Every subscriber knew, or must be presumed to have known, what was plainly written in his stock subscription and in the mineral deed which he executed. This action is in substance an action by plaintiffs against other stockholders for cancellation of stock. The deeds which became void, under 79-420, *supra,* were presumably valid when executed and delivered to the company. Invalidation of the deeds did not result from anything done by the grantors but from failure of the grantee to comply with the statute. Whether upon some sort of showing equitable jurisdiction might be exercised to require new deeds from the original grantors in an action by the corporation itself we express no opinion. But certainly if the corporation would be estopped from maintaining such an action the corporation cannot be directed, in an action by individual stockholders, to cancel the stock. Again, in the case of mineral rights lost by the company through foreclosure of mortgage on the land, are individual stockholders entitled to bring this action when the mineral deeds clearly contemplated the possibility of such a result? We think not. If any right of action exists it would be one brought by the corporation or in its name. And again we here express no opinion upon the question of estoppel or other questions that might be raised in such an action.

We are mindful of the rule that courts of equity have jurisdiction, in an action by individual stockholders, to enjoin the officers from performing *ultra vires* acts to the injury of such stockholders where the acts complained of constitute a breach of trust, where there is no adequate remedy at law and such relief is necessary to attain justice. (13 Am. Jur. 497, 499.) The contemplated acts which plaintiffs seek to enjoin—the paying of dividends and the according of voting privileges—are obviously not in themselves *ultra vires.* Nor is it so contended. The contention is simply, in substance, that certain stock should be canceled—conditionally— for failure of consideration subsequent to issuance of the stock. No fraud or conspiracy is charged. Be that as it may, the right of

individual stockholders to maintain such an equitable action, in their own name, must in all events be clearly shown.

As heretofore noted, inequalities clearly inhered in the plan which the company promoted. Subscribers became stockholders with clear knowledge of that fact. It is contended that further and perhaps more glaring inequalities have now resulted through failure of the corporation to record deeds or through foreclosure of mortgages. This is not an action to recover from the corporation for its alleged failure to record the deeds. And for reasons already stated, subscribers who joined a coöperative enterprise based on mineral deeds with such mortgage provisions as those heretofore discussed are hardly in a position to complain about results which flowed from those provisions.

Unquestionably the general doctrine of estoppel applies—and with special force—to individual stockholders who bring an action, equitable in character, against the corporation. And especially so when their suit is in reality against other individual stockholders. (13 Fletcher Cyclopedia Corporations, perm. ed., pp. 207-220; 13 Am. Jur. 512; 18 C. J. S. 1290, 1291, and cases cited, note 36.) Counsel have not called our attention to any cases exactly similar to the one before us, nor has our own research produced one, but the cases are legion whose reasoning support application here of the doctrine of estoppel. In *Wormser v. Metropolitan Street Ry. Co.*, 184 N. Y. 83, 76 N. E. 1036, in which an individual stockholder sought to restrain the defendant corporation from carrying out certain acts and the doctrine of estoppel was successfully invoked in defense, it was said: "Whether his conduct (acceptance of pecuniary benefits) constituted an estoppel in the strict sense of the term, or a quasi-estoppel . . . or be denominated merely an acquiescence or an election, or *the assumption of a position inconsistent with an attack,* makes no essential difference." (Italics supplied.) In point, or in general support, see: *Harmeyer v. Anderson* (La. App.), 156 S. 53, 55; *Finch et al. v. Warrior Cement Corp., et al.,* XVI Del. Chancery Reports, 44; *Johnson v. King-Richardson Co.,* 36 F. 2d 675; *McCallum v. Wing,* 30 F. 2d 505, 509; *Allenhurst Park Estates v. Smith,* 101 N. J. Eq. 581, syl. ¶ 8, 138 Atl. 709.

It follows from what has been said that the judgment must be reversed with directions to enter judgment for the defendants. It is so ordered.

DAWSON, C. J., and PARKER, J., not participating.