58   463
d69   503

JOAB MULVANE v. MARY ANN O'BRIEN, *Administratrix.*

## No. 10184.

OFFICER OF CORPORATION — *taking advantage of stockholder's ignorance of value of stock, selling at advance over stockholder's price and concealing facts, liable to stockholder for all profit made.* The stockholders of a corporation, being ignorant of the selling value of their stock, authorized the president of the company to find a purchaser and effect a sale of their shares at par; and such president, at and before such time, was in secret correspondence and negotiation for the sale of the stock, with a view to a large profit to himself, and by affirmative acts and misrepresentations concealed his transactions from the stockholders, and effected a sale of their stock for a sum largely in excess of par. *Held*, that he cannot retain such excess, but must account to the stockholders for the profits made; notwithstanding he had stated to them that he would retain for his services as agent any sum realized above that for which he was authorized to sell.

Error from Shawnee District Court. Hon. Z. T. Hazen, Judge. Opinion filed July 10, 1897. *Affirmed.*

*A. L. Williams, N. H. Loomis* and *R. W. Blair,* for plaintiff in error.

*Rossington, Smith & Dallas* and *Clifford Histed,* for defendant in error.

DOSTER, C. J.   This was an action brought by O'Brien to compel Mulvane to account for profits alleged to have been made by him by betraying the confidence of O'Brien, who had intrusted him with the sale of certain shares of stock in the Topeka Water Supply Company, a corporation. The petition alleged that, from 1884 to 1890, when the sale of stock was consummated, Mulvane as president, and O'Brien as secretary, were the practical managers of the company's affairs ; that, being thrown much together, a relation of mutual confidence developed between them, so that, when, in November, 1889,

Mulvane wrote to O'Brien, then at Hot Springs, Ark., proposing to endeavor to effect a sale of all the stock of the company and asking him to transfer his shares in blank, he did as requested, and agreed that his stock might be sold at par; that Mulvane, who had been already negotiating for a sale of the stock at a price much above par, but had concealed the fact, afterwards sold the total stock for $150,000 more than par; and, concealing this fact also, he settled with O'Brien by paying him the par value of his shares, and, upon the discovery of his duplicity, refused to account for the excess. The entire stock of the company consisted of four thousand shares of one hundred dollars each. O'Brien owned seventy-five shares, for which Mulvane paid him seventy-five hundred dollars. The petition prayed judgment for $2,812 as the amount withheld. A demurrer by Mulvane having been overruled, he filed a general denial. The issues thus raised were tried by the court, and voluminous findings of fact were made upon which judgment for $2,367 was rendered in favor of O'Brien. This proceeding is brought to reverse that judgment.

After reciting the organization of the company, and stating that, on account of their business relations and their official positions, Mulvane and O'Brien "became mutually acquainted, each having great confidence in the honesty, integrity and business qualifications of the other;" that during the summer of 1889, O'Brien desired to dispose of the stock, but Mulvane opposed it until in October, 1889, when he expressed a willingness that the plant and stock should be sold; that, in July, 1889, Mulvane, as president, was authorized to negotiate for the taking up of the mortgage bonds of the company by replacing them with new bonds; that in October, 1889, one Hanson, and, in November, Hanson and one Westcott,

visited Topeka with a view to buying the plant and stock and made thorough examination of the books and the property, but Mulvane led O'Brien to believe these examinations were with reference to taking up the company's bonds, the findings proceed :

"10. On November 13, 1889, Westcott and Hanson submitted a proposition in writing to defendant to pay the sum of $500,000 for the capital stock of said corporation, which proposition is in words and figures as follows, to wit :

"'Topeka Water Supply Company, Office 111 East Seventh Street, Topeka, Kan., November 13, 1889.

"'WHEREAS, Joab Mulvane, Esq., of Topeka, Kan., and his associates, own the stock of the Topeka Water Supply Company, said Mulvane owning in his own right a majority thereof and being disposed to sell his stock and to advise his associates to sell their stock in said company on the terms and conditions hereinafter stated ; and whereas, Geo. R. Westcott, of Portland, and Samuel Hanson and associates desire to purchase the capital stock and property of the said Topeka Water Supply Company, it is hereby agreed that said Westcott and Hanson will pay said Mulvane and associates par for said stock, and pay Joab Mulvane, Esq., the further sum of $100,000 for the control and the carrying out of the above sale and transfer of said stock to said Westcott and Hanson, delivery thereof to be made in New York or Boston, as the said Mulvane may elect. Said Mulvane on his part agrees to deliver the stock, amounting to $400,000 par value, on or before January 1, 1890 ; also to perform such services in the formation of a new company, if one is required to be formed, as such Westcott and Hanson may require to be done.        GEO. R. WESTCOTT.
SAM'L HANSON.'

"11. Defendant withheld from plaintiff and the other stockholders and officers of said corporation the fact that the proposition above set out had been made, and withheld from plaintiff and the other stockholders and persons interested in said corporation the fact that Westcott and Hanson were contemplating the purchase of said plant.

30—58 KAN.

"12. On November 23, 1889, defendant wrote to plaintiff at Hot Springs, Ark., where he had previously gone for his health, that he was going East in the interest of the Topeka Water Supply Company, and if he, the plaintiff, wanted to sell his stock, he had better transfer it to defendant for that purpose. Plaintiff did transfer his stock to defendant at par value.

"13. Shortly after plaintiff went to Hot Springs, Ark., for his health, an expert engineer was sent to the city of Topeka by Coffin & Stanton, of New York City, to make a personal examination of this plant for the purpose of purchasing the same, the defendant having previously had correspondence with said Coffin & Stanton in relation thereto. Thereafter, and while plaintiff was at Hot Springs, defendant wrote to plaintiff that he was having an expert water engineer examine the plant and give his judgment as to what ought to be done in the future in reference to extensions, and as to any defect in said plant, representing that this examination was being made to be sure the company was building broad enough.

"14. On November 23, 1889, defendant addressed a general letter to the stockholders of said company, one of which was received by plaintiff, being then at Hot Springs, Ark., in which was the following : 'Together with other stockholders, I believe the time has come to sell our Topeka Water Supply Company stock, and thinking that you might also desire to sell, I write you this letter. I shall go East soon, and while there will endeavor to find a buyer for the stock of those parties wishing to sell. If you desire to sell, put a price upon your stock, said price good for ninety days after delivery to me, and send me your stock indorsed in blank. If you choose to do this I will at the end of ninety days either return you your stock or pay you for it at the price you put upon it.' At the time of writing this letter, defendant held in his possession the written proposition of Wescott and Hanson, hereinbefore set out. At the time of receiving the letter last above quoted, plaintiff received also another letter from defendant which contained the following : 'Inclosed I send you a letter, as I have sent to stock-

holders, and from the responses already received and stock turned over, it looks as though all would turn their stock over. I have given them a receipt such as inclosed, which gives me absolute ability to deliver if we can effect a sale within the limit named, ninety days, and the price named by various owners is from ninety to one hundred. This gives me an option on the stock at the price named, for the time named, and any sum I can get over that I shall want to keep for my services in hunting a buyer and effecting a sale. If you wish to put your seventy-five shares on this basis, I wish you to so write me, and fill out the form of receipt inclosed, returning it to me, and also return to me the receipt you now hold, and I will sign the new one and return it to you. Meantime this letter is an acknowledgment that I hold seventy-five shares of your stock. I expect to go East next week and will make as thorough an effort as I can. Will go to New York, Philadelphia, and Boston. I have filled out the receipt at par. You can write a new one if that does not suit you. Please answer promptly.'

"15. Upon the receipt of the foregoing letter, plaintiff, believing that no negotiations for the sale of said plant or stock had been entered into by defendant with any person or persons whomsoever, and that no proposition of purchase had been made, and relying upon the statements made by defendant, and having no knowledge of the written proposition in the possession of defendant, signed the receipt heretofore referred to and forwarded the same to defendant. Said letters were written by defendant for the purpose of inducing plaintiff to part with his stock in said corporation. Plaintiff would not have parted with his stock at par value, had he been advised of the proposition of purchase made by Westcott and Hanson, and of the other information then within the possession of defendant, which information was obtained by defendant by reason of his being president of said corporation.

"16. Plaintiff was the owner of seventy-five shares of stock of one hundred dollars each, the par value being seventy-five hundred dollars, and defendant has paid plaintiff upon said stock the sum of seventy-five hundred dollars.

"17. On December 4, 1889, the defendant wrote to Westcott and Hanson that he would be in Boston in about ten days from that date and would then be prepared to talk with them definitely with reference to the sale of the entire stock of said company. On December 4, 1889, defendant wrote to plaintiff at Hot Springs, Ark., as follows: 'Inclosed please find receipt. The other one you can destroy when you get home. I have all the stock now but a few shares. I expect now to go East Monday or Tuesday. No business of moment at last meeting. Money is very close East, and I have some fears that my trip will be fruitless, but will try, and may lead to some results further on.'

"18. On December 14, 1889, defendant made to Westcott and Hanson the following proposition: 'I will sell you the entire stock of the Topeka Water Supply Company, which consists of 4,000 shares of par value of $100 per share, for the sum of $500,000 on the following terms of payment, viz.: The sum of $60,000 to be paid in cash on the signing of the contract to be made and entered into as of this date, the consideration named in said contract to be $440,000, to be paid as follows: The sum of $200,000 to be paid February 10, 1890; $140,000 to be paid February 20, 1890; $100,000 to paid March 20, 1890; provided, that final payment of the last-named sum of $100,000 may be made on February 20, 1890, if said Westcott and Hanson may elect so to do, by giving me five days' notice of such intention; payments to be made for, and delivery of stock to be made at, the National Bank of North America, in the city of Boston, Massachusetts.—JOAB MULVANE.'

"The foregoing proposition was accepted by Westcott and Hanson. Shortly after the acceptance of the above proposition, defendant received from Coffin & Stanton a more favorable proposition for the purchase of the entire capital stock of the Topeka Water Supply Company, and thereupon defendant abandoned the contract entered into between himself and Westcott and Hanson, and entered into a new contract whereby he sold to Coffin & Stanton the entire capital stock of said company for the sum of $550,000 — being $150,-

000 more than par for said stock — and has received from said Coffin & Stanton the sum of $550,000 therefor.

"19. After defendant had made said sale and returned to Topeka, he withheld from plaintiff and other persons interested in said corporation knowledge of the fact that a sale had been made, and plaintiff did not learn of the amount for which said stock had been sold until on or about the fifth day of February, 1890 ; at that time defendant had acquired all the capital stock of the Topeka Water Supply Company, and had transferred all its property and assets to a corporation formed by Coffin & Stanton in pursuance to said purchase by them.

"20. Defendant has expended in completing and carrying out the sale of said stock and as expenses connected therewith, the sum of about fifty thousand dollars."

The evidence upon which the findings of fact were based justifies much severer strictures upon the conduct of plaintiff in error than those in which the court below indulged. It discloses a course of duplicity, unfaithfulness, and falsehood, which can only be characterized in the strongest terms of censure. However, we need concern ourselves with nothing but the questions of law which arise upon the findings made.

The claimed errors consist in overruling a demurrer to the petition, in refusing to render judgment for defendant upon the findings of fact, and in rendering judgment for plaintiff on such findings. It is conceded that the findings of fact embrace the material allegations of the petition ; therefore, the demurrer to the petition, the motion of defendant for judgment on the findings, and the sufficiency of the findings to uphold the judgment in favor of plaintiff, may be discussed as a single proposition. We have no hesitation in affirming the judgment and rulings of the court below.

The case is viewed by the plaintiff in error as

though it were a purchase by a director or other officer in a corporation of the shares owned by fellow stockholders. It is contended that, in such cases, the director or officer stands in no fiduciary relation to the stockholder, and is therefore privileged to buy, and under no obligation to disclose information, peculiarly within his knowledge, as to the value of the stock. His view of the facts of this case and the law applicable thereto, is paralleled by the decision of *Carpenter v. Danforth* (52 Barb. [N. Y.] 581), and *Comm'rs of Tippecanoe Co. v. Reynolds* (44 Ind. 509). In the first of these cases, it was said :

"Hence a sale of stock, by a stockholder to a director, or the stock itself, is not so far connected with, or the subject of, the trust or trust relation, which is admitted to exist, as to subject the director to, or give the seller the benefit of, the principle of equity applicable to the dealings and contracts of parties between whom there is a trust or confidential relation, and to require the purchaser to prove not only that he paid a full and fair price for the stock, but also that he disclosed to the seller every fact or circumstance known to him, and not known to the seller, material on the question of the value of the stock."

In the Indiana case it was likewise said :

"The president of a railroad company, who was also one of its directors, having knowledge, by reason of his official position, that the true value of the stock of the company was very largely in excess of its nominal market value, purchased, at much less than its real worth, the stock of a non-official stockholder, who was ignorant of the company's financial condition, and of facts giving an extraordinary value to the stock, without disclosing to the seller the facts and circumstances within his knowledge as to its real value. *Held*, that the relation of trustee and *cestui que trust* did not exist between the parties, and that in the absence of actual fraud the purchase was valid. The purchaser was not bound to communicate to the seller his knowledge of the worth of the stock, *although the*

*same was obtained by reason of his official relation to the company*, nor was the purchaser required, in order to make a valid purchase, to pay a fair and adequate price for the stock.''

These and other like decisions do not apply to the facts before us. The evidence and findings in this case do not show a sale of stock by a shareholder to a director or other officer. They show an agency for sale in the officer for the stockholder. The defendant did not buy the stock of plaintiff for himself. He undertook to sell it, for the stockholder, to other parties. In doing so, he took upon himself all the obligations of good faith and fair dealing involved in the trust relation of principal and agent. But, if the findings were otherwise — if they were that plaintiff and defendant were simply buyer and seller of stock — the transaction, under the circumstances of concealment and misrepresentation by the defendant, as disclosed by the record, could not stand. The very authorities upon which the defendant principally relies, exclude from the purview of the decisions made such cases as the one before us. In *Carpenter v. Danforth*, supra, it was observed :

'' Where there was no evidence to show that on a sale of stock by a stockholder to a director of the corporation the purchaser made no material representation as to the affairs or condition of the company, or of any fact material to the question of the value of the stock, or any false representation of a material fact, that induced the sale ; or that he either *did* or *said* anything to mislead the seller, or to divert or prevent him from ascertaining all that could then be known of the affairs, condition and prospects of the company; or from making any inquiry as to any fact material on the question of the value of the stock ; or that the purchaser *did* anything which misled or deceived the plaintiff, or was likely to mislead or deceive him ; or which diverted or was likely to divert or prevent him from learning all that he, the purchaser, knew about

the value of the stock, or any fact material to the question of value ; *Held* that under these circumstances the sale could not be declared void, on the ground of fraudulent representations of material facts, or fraudulent concealment of material facts, by the purchaser.''

It is not true, as argued by the defendant, that the directors and officers of a corporation are trustees only in relation to the corporate entity and the corporate property, . They are, in some respects and to some extent, also trustees of the corporate shareholders as well.   Perhaps, no general rule, comprehensive of all the instances in which their trusteeship exists, can be laid down ; but it is safe to say that cases in which the officer, by virtue of his position as such, with the superior opportunities it affords of acquiring information not possessed by the stockholder but vital to his interests, acquires such information, are cases which, upon grounds of trust and confidence, preclude all artifice and deception upon his part when conscience and fair dealing require a disclosure.   Mr. Pomeroy, in his work on Equity Jurisprudence (section 1090), states in general terms the dual relation of trust which the officer occupies to the corporation, and its shareholders also :

'' Stockholders, individually and separately, hold the full title, legal and equitable, to their respective shares of stock.   A stockholder does not, by virtue of his stock, acquire any estate, legal or equitable, in the corporate property ; he obtains only a right to participate in the lawful dividends while the corporation is in being, and to his proportionate share of the net assets upon its dissolution and final settlement. Shares of stock, however, are regarded by courts of law and of equity as a species of property, as vendible in the market, as having a pecuniary value, and as clothing their owner with proprietary rights which will be protected and enforced.   From this analysis it is obvious that, so far as the trust embraces or is

concerned with the *corporate property*, the directors and managing officers occupy the position of *quasi* trustees toward the *corporation* only ; there is no relation of beneficiary and trustee, having the corporate property for its subject-matter, between the stockholders and the directors. The directors are also agents for the corporation, but that fact does not prevent them from being in a partial sense trustees for the corporation. The important conclusion I repeat, that this phase of their trust is concerned with and confined to the corporate property ; from it arise their fiduciary duties towards the corporation in dealing with such property, and the equitable remedies of the corporation for a violation of those duties. On the other hand, the directors and managing officers occupy the position of *quasi* trustees towards the stockholders alone, and not at all towards the corporation, with respect to their shares of stock. Since the stockholders own these shares, and since the value thereof and all their rights connected therewith are affected by the conduct of the directors, a trust relation plainly exists between the stockholders and the directors, which is concerned with and confined to the shares of stock held by the stockholders ; from it arise the fiduciary duties of the directors towards the stockholders in dealings which may affect the stock and the rights of the stockholders therein, and their equitable remedies for a violation of those duties. To sum up, directors and managing officers, in addition to their functions as mere agents, occupy a double position of partial trust; they are *quasi* or *sub modo* trustees for the corporation with respect to the corporate property, and they are *quasi* or *sub modo* trustees for the stockholders with respect to their shares of stock.''

To the same effect, see *Perry v. Pearson*, 30 Ill. App. 389 ; *Forbes v. McDonald*, 54 Cal. 100 ; *Twin-Lick Oil Co. v. Marbury*, 91 U. S. 587.

But the consideration of this case may be divorced entirely from the fact of the special relationship of corporate officer and corporate shareholder, and centered upon the fact of the special agency for the sale

of the stock, conferred upon plaintiff in error. He was specially authorized to find a purchaser and negotiate a sale. At the very time the correspondence and other communications leading to the contract of agency were in progress, he was in receipt of a proposition of purchase. At that time, also, he was in correspondence with other parties looking to a sale to them. The proposition already made was of a sum largely in excess of what the shareholders were offering their stock for. The correspondence with the other parties eventuated in a still more advantageous offer. The plaintiff in error not only withheld information of these offers, but by affirmative misrepresentations concealed all knowledge of the same. He said that the visit of the first person who came to inspect the company's property possessed no importance to the stockholders; when he knew that it was with a view to the purchase of the corporate stock. He said that he was having the corporate property examined by an expert with a view to the promotion of the corporate interests; when, as a fact well known to him, such expert made his examination as the representative of prospective buyers, with whom a deal was presently closed.

It is no answer to say that the defendant, during the correspondence which led up to the contract of agency, stated to the plaintiff that he would retain for his services any sum above par realized upon a sale of the stock, and that the plaintiff assented to the same by not objecting thereto. By most disingenuous practices, the defendant had concealed the fact that a large profit could be realized on a sale of the stock, and he cannot be allowed to trammel up the legal consequences of his deception by a mere show of candor and honest dealing. The judgment of the court below is affirmed.