No. 56,332

HOMER H. OBERHELMAN, *Appellant,* v. BARNES INVESTMENT CORPO-
RATION and ARTHUR M. NEASE, JR., *Appellees.*

(690 P.2d 1343)

Opinion filed
November 30, 1984.

*Charles S. Arthur, III,* of Arthur, Green, Arthur & Conderman, of Manhattan, argued the cause and was on the brief for appellant.

*Bruce H. Wingerd,* of Clay Center, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: This is an action brought by a minority shareholder of a close corporation on his own behalf and as a stockholder's derivative action on behalf of the corporation. Plaintiff, Homer H. Oberhelman, seeks to recover the principal and interest on loans Barnes Investment Corporation (Barnes, or the corporation) made to defendant Arthur M. Nease, Jr., who is the majority shareholder, president, and chairman of the Board of Directors.

Plaintiff also sought punitive damages. The trial court entered judgment for defendants and plaintiff appeals.

The trial court, in its memorandum decision, made the following findings of fact with which plaintiff concurs:

"1. The defendant, Arthur M. Nease, Jr. purchased the controlling interest of the State Exchange Bank of Barnes, Kansas, in 1963, and has been president of the bank since that time. In 1964, he invited Homer H. Oberhelman, the plaintiff, to serve as a director of the bank and he served in that capacity until his resignation in January, 1981.

"2. The Barnes Investment Corporation was formed May 1, 1969. The sole shareholders, directors and officers of the corporation were Arthur M. Nease, Jr., president and treasurer, owning 80% of the stock; Homer H. Oberhelman, vice-president, owning 20% of the stock, and Marilyn Nease, wife of Arthur, secretary, owning one share of stock. There has never been any change in the shareholders, directors or officers.

"3. The Barnes Investment Corporation was formed to hold the shares of The State Exchange Bank for the purpose of a tax shelter as to the dividend income paid by the bank.

"4. When he purchased control of the bank, Nease also acquired an insurance agency which operated in the bank building. The ownership of the insurance agency was transferred to the investment corporation to satisfy Internal Revenue Service regulations and the premium income accrued to the investment company. Nease was the agent who wrote policies on behalf of the insurance company and serviced them. He was the individual responsible for the conduct of the insurance business although other persons working in the bank did some of the routine work of the agency from time to time.

"5. In two separate letters, or memoranda, from Nease to Oberhelman in early 1969, Nease outlined his purposes in the formation of the investment corporation, the estimated income, assets and liabilities. As outlined, the net income of the investment corporation would be utilized to reduce a loan from a Kansas City bank incurred for the purchase of bank stock in the amount of $57,000.00. Nease also informed Oberhelman by these letters that he would be willing to purchase the stock of Oberhelman in the investment corporation at some time in the future.

"6. By a letter memorandum signed by both men and dated July 3, 1971, Oberhelman agreed that he would not sell his stock in the investment corporation until 1976 when Nease would purchase it according to one of two options stated in the agreement.

"7. Formal meetings of the officers, directors or stockholders of The Barnes Investment Corporation were never held after its formation until July, 1983. Nease and Oberhelman discussed matters concerning the corporation at bank director meetings and on numerous informal meetings between the men. These discussions were never reduced to any writing in the nature of minutes.

"8. Nease, as managing officer of The Barnes Investment Corporation, began making loans to himself from the corporation in 1972. Through 1982, these loans reached a total of $82,712.03, and in 1983 the total became $89,912.03. The Kansas City bank loan of $57,000.00 was not reduced.

"9. The loans to Nease made by the investment corporation are interest free

and unsecured. There are at least two indications of interest being paid on the loans, but in each instance, Nease claimed a management fee in the exact amount of the interest and, effectively, the loans bear no interest.

"10. In 1976, when discussions arose between Nease and Oberhelman concerning the purchase of Oberhelman's stock by Nease, Oberhelman directed his accountant to determine the fair market value of his stock. In addition to other records, the accountant examined the corporate annual reports filed with the Secretary of State.

"11. A written agreement to purchase was prepared, but apparently misstated the purchase price by $2,000.00 and it was to be corrected. For reasons not clear, and not too important, the agreement was never completed and nothing else was done as to the 1971 purchase agreement until 1981.

"12. During the investigation by Oberhelman's accountant into the affairs of the investment corporation, it was discovered that Nease had made loans to himself from the investment corporation.

"13. In 1978, Oberhelman examined the books of account of the investment corporation. He asked Nease what rate of interest he was paying on his loans, and Nease responded with 'going rate' or 'market rate.'

"14. Oberhelman was a regular participant in the directors' meetings of The State Exchange Bank. He was aware of the dividends paid by the bank to the investment corporation, and participated in 1978, and annually thereafter, in the resolution giving Nease the right to operate the insurance agency on bank premises and to share in the profits of the agency.

"15. Very early in July, 1980, immediately following the meeting of the bank directors, Oberhelman learned for certain that the loans to Nease were not interest bearing. He did not call a meeting of the investment corporation directors or stockholders. He did not then discuss the matter further with Nease nor·did he seek the advice of his accountant or attorney.

"16. The books of account of The Barnes Investment Corporation were at all times open and available to Oberhelman for his inspection."

It was stipulated at pretrial that if a meeting of the shareholders of Barnes were to be held that a majority of the shares would be voted to ratify and affirm the loans made to Nease and that the Oberhelman shares would be voted against such a proposal. In fact, in July, 1983, after this suit was filed a formal meeting of the stockholders was held and a resolution to ratify and affirm the loans was passed with the Nease shares being voted in favor and the Oberhelman shares being voted against the resolution. At about the same time a formal board of directors meeting was held and an employment contract entered into between Barnes and Nease. While the parties seem to contend that Nease and Oberhelman were the only shareholders, the record indicates that Mrs. Nease and Mrs. Oberhelman each owned one share of stock. Additional facts will be presented as they become pertinent to the issues on appeal.

In holding for the defendants the trial court made the following conclusions of law:

"1. The loans made to Arthur M. Nease, Jr. by The Barnes Investment Corporation are not unlawful or void transactions but are specifically authorized by K.S.A. 17-6303.

"2. The loans have been ratified and affirmed by a majority of the voting stock of The Barnes Investment Corporation.

"3. Plaintiff's purported cause of action is barred by the statute of limitations, K.S.A. 60-513(a)(3)(4).

"4. Considering the great amount of time elapsing between the time when the plaintiff learned of the loans and when he determined to file this action, the plaintiff is barred from maintaining the action by the doctrine of laches.

"5. Plaintiff acquiesced in the loan policies of The Barnes Investment Corporation and is now estopped to deny their validity.

"6. Judgment is entered herein for the defendants and against the plaintiff. Costs are taxed to the plaintiff."

Before turning to the specific issues a review of several general principles relating to the duty of a corporate director and officer is in order. In *Newton v. Hornblower, Inc.,* 224 Kan. 506, 582 P.2d 1136 (1978), we held:

"Officers and directors of a corporation occupy a strict fiduciary relationship with respect to both the corporation and its shareholders. The same fiduciary standard applies as between directors." Syl. ¶ 8.

"Any unfair transaction undertaken by one in a fiduciary relationship may result in liability for unjust enrichment of the fiduciary. Where the fairness of a fiduciary transaction is challenged, the burden of proof is upon the fiduciary to prove by clear and satisfactory evidence that such transaction was fair and done in good faith." Syl. ¶ 9.

"When compensation is voted by the officer-directors of a corporation to themselves, the amount must be reasonable and commensurate with the value of the services rendered and the burden of proving the same is upon such directors." Syl. ¶ 12.

"Punitive damages, as well as actual damages, are proper where a breach of a fiduciary duty is involved." Syl. ¶ 13.

In a closely held corporation where one director or officer has a superior knowledge of corporate affairs because he is intimately involved in the daily operations of the corporation while the other director or officer has only a limited role in corporate management, the fiduciary duty is the same as if the latter were a stockholder not actively engaged in corporate affairs. *Sampson v. Hunt,* 222 Kan. 268, 272, 564 P.2d 489 (1977). Directors and officers are liable to the corporation and the stockholders for losses resulting from their malfeasance, misfeasance or their

failure or neglect to discharge the duties imposed by their offices. *Speer v. Dighton Grain, Inc.,* 229 Kan. 272, Syl. ¶ 8, 624 P.2d 952 (1981).

The first issue on appeal is whether the interest-free loans to Nease were lawful and whether under the facts of this case they could be ratified and affirmed by a majority vote of the stockholders. The trial court found the loans were specifically authorized by K.S.A. 17-6303 and were ratified by the stockholders pursuant to K.S.A. 17-6304. The statutes provide:

"17-6303. Any corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, *whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation.* The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured *in such manner as the board of directors shall approve,* including, without limitation, a pledge of shares of stock of the corporation. Nothing contained in this section shall be deemed to deny, limit or restrict the powers of guaranty or warranty of any corporation at common law or under any statute."

"17-6304(a) No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee *in good faith authorized the contract or transaction by the affirmative votes of a majority of the disinterested directors,* even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved *in good faith* by vote of the shareholders; or

(3) The contract or transaction *is fair* as to the corporation as of the time it is authorized, approved or ratified by the board of directors, a committee thereof or the shareholders." (Emphasis added.)

At the time of the incorporation of Barnes in 1969, the corporation incurred an interest-bearing obligation of $57,000.00 which was borrowed for the purpose of purchasing stock in the State Exchange Bank of Barnes, Kansas. At the same time the corporation acquired the insurance business of Nease and it was

represented to Oberhelman that the premium income from the insurance agency, along with the dividends received on the bank stock, would be used to retire the $57,000.00 debt. Nothing was ever paid toward the reduction of that initial amount and, in fact, the interest-bearing debt of Barnes was increased to approximately $130,000.00 by 1983. During all those years interest at rates of from 6% to 19% per annum was being paid by Barnes and its interest-bearing debt increased while at the same time income was being diverted to Nease in the form of interest-free loans. It also appears that during some years funds borrowed at interest were being loaned or paid to Nease at no interest. While Nease makes quite an argument that all of this was for the ultimate benefit of Barnes and its stockholders, including Oberhelman, it appears Nease was the only one to reap any benefit from the scheme.

K.S.A. 17-6303 authorizes loans to officers and employees when the loans, in the judgment of the directors, "may reasonably be expected to benefit the corporation." Did the legislature contemplate that loans of the type made to Nease would be authorized by the statute? We think not. Nease testified that he had no intention of repaying the loans in the foreseeable future but they would be repaid if he ever sold his interest in the corporation and that he would continue to withdraw funds from the corporation on a no interest basis unless stopped by the courts. He further testified the withdrawals were not really loans in the usual sense but constituted a payment to him in lieu of a salary for services rendered the insurance agency so that he could take money from the corporation for his personal use without paying income taxes upon it. When the propriety of these loans was questioned by the examiners from the Federal Reserve Bank of Kansas City Nease replied, in part:

"The Barnes Investment Corporation was formed in May, 1969, to shelter the dividend income I received from the State Exchange Bank, Barnes, Kansas. . . . [T]he sole purpose and reason for [existence] of the Company was to relieve me of the necessity of declaring as personal income the income from insurance activities and the dividend income from the bank stock. . . .

". . . Initially I did not [chose] to take any money out of the Company in compensation for my insurance work. When I decided I needed to receive some portion of the insurance income for personal use, the interest free loan method was suggested as a means of disbursing funds for my use without the creation of additional tax liability for me. . . .

"[W]hile this expenditure of funds is carried on the balance sheet as a Loan, it is not a loan in the traditional sense. . . .

". . . The undersigned and Barnes Investment Corporation are, for all intent and purpose, one and the same. Whatever benefits Barnes Investment benefits me more than anyone else. Whatever benefits me financially benefits Barnes Investment because Barnes Investment or the subsidiary bank provide the funds for my personal expenditures."

While the foregoing are only a few of the statements of Nease in one of his letters, they aptly disclose that his purpose was not the welfare of Barnes Investment and its other stockholders but his own personal benefit.

K.S.A. 17-6303 was first adopted as a part of the adoption of the 1972 General Corporation Code and was based upon §143 of the Delaware Code. In Vernon's Kansas Statutes Annotated §17-6303 (1975), the authors, in their comments to the statute, state:

"This section of the 1972 Code authorizes a corporation to loan money to, or guarantee any obligation of, any officer or other employee whenever in the judgment of the directors such assistance may reasonably be expected to benefit the corporation. Such assistance may be with or without interest and may be unsecured or secured to the satisfaction of the board. The assistance may be so extended to any officer or employee who is also a director of the corporation or of its subsidiary. Former Kansas law, K.S.A. 17-3006, prohibited a corporation, other than a building and loan association, from loaning money to an officer or director, and imposed a joint and several liability upon those making such a loan for its repayment. The new section is identical with section 143 of the Delaware code. Those advocating this liberalization in Delaware and elsewhere urged a necessity of *temporarily assisting* even salaried officers and officer-directors who are being moved about the country with greater frequency and often upon short notice by management in today's commercial world." (Emphasis added.) p. 277.

See also Comment, *The Voidability of Interested Director Contracts Under the Kansas Corporation Code,* 24 Kan. L. Rev. 655 (1976); Treadway, *The Kansas Corporation Code of 1972,* 40 J.B.A.K. 301, 341 (1971). Thus we are of the opinion that the present loans were not made pursuant to the specific requirements of the statute nor for any valid purpose contemplated by the legislature in enacting the statute.

Nease argues that in any event the loans were ratified and affirmed under the provisions of 17-6304 at a formal meeting of stockholders held in July, 1983, and the trial court concluded as a matter of law that the loans had been affirmed and ratified by a majority of the voting stock. In the comments to the statute, Vernon's Kansas Statutes Annotated states:

"This section, while new to Kansas statutes, presents a codification of a

common law rule that has evolved in several other jurisdictions. It declares that no contract or transaction between corporations having common officers or directors is to be held void or voidable *solely for that reason,* where any one of the following three factors appear: (1) The material facts were disclosed or were known and the board of directors acted in good faith through a disinterested majority, even though they may have been less than a quorum; or (2) where the contract or transaction was specifically approved by a good faith vote of the stockholders with knowledge of the circumstances; or (3) where the transaction was fair to the corporation *at the time it was approved.* Likewise, a transaction will be neither void nor voidable merely because an officer or director was present at, or participated in, a meeting of the board or of a committee which authorized the transaction, or simply because his vote was cast for that purpose, if any one of the above factors are present. In any event, a common or interested director may be counted in determining the presence of a quorum at the meeting of the board or of a committee which authorized the contract or transaction." (Emphasis in original.) p. 279.

Subsection (a)(1) of the statute provides that a transaction with an officer or director is not void or voidable when authorized in good faith by a majority of the knowledgeable, disinterested directors of the corporation. A "disinterested majority" is not possible in this case, where defendant Nease and his wife comprise 66⅔% of the board. Subsection (a)(2) permits ratification of such a transaction by a good faith vote of a majority of informed shareholders, with no specific requirement that the shareholders be disinterested. Subsection (a)(3) of 17-6304 permits ratification by the board of directors or the shareholders, again with no specific requirement they be disinterested, so long as the contract or transaction is fair to the corporation as of the time of approval. Obviously the transactions in question could not be considered fair to the corporation and subsection (a)(3) has not been complied with. Does subsection (a)(2) preclude plaintiff's action herein and relieve Nease of the burden of proving the loans were fair and in the best interests of the corporation? We think not. K.S.A. 17-6304 merely provides that corporate transactions with an officer or director shall not be void or voidable if certain criteria set forth in the statute are met.

K.S.A. 17-6304 is identical to Del. Code Ann. tit. 8, § 144 (1974). Facts very similar to those presently before us were presented to the Delaware Supreme Court in *Fliegler v. Lawrence,* 361 A.2d 218 (Del. 1976). *Fliegler* was a shareholder derivative action brought against corporation officers and directors for wrongfully usurping a corporate opportunity, and wrongfully profiting by causing the corporation to exercise an

option to purchase that opportunity. The Delaware Supreme Court held that, notwithstanding a shareholder ratification of the transaction under § 144(a)(2) [K.S.A. 17-6304(a)(2)], the burden remained on defendants to establish the intrinsic fairness of the transaction.

"[I]t is clear that the individual defendants stood on both sides of the transaction in implementing and fixing the terms of the option agreement. Accordingly, the burden is upon them to demonstrate its intrinsic fairness. [Citations omitted.] [While] the record reveals no bad faith on the part of the individual defendants . . . that is not determinative. The issue is [whether the transaction in question was fair to the corporation].

"Preliminarily, defendants argue that they have been relieved of the burden of proving fairness by reason of shareholder ratification of the [transaction under § 144(a)(2)].

. . . .

"The purported ratification by the Agau shareholders would not affect the burden of proof in this case because the majority of shares voted in favor of exercising the option were cast by defendants in their capacity as Agau shareholders. Only about one-third of the 'disinterested' shareholders voted, and we cannot assume that such nonvoting shareholders either approved or disapproved. Under these circumstances, we cannot say that 'the entire atmosphere has been freshened' and that departure from the objective fairness test is permissible. [Citations omitted.]

. . . .

"Defendants argue that the transaction here in question is protected by § 144(a)(2) which, they contend, does not require that ratifying shareholders be 'disinterested' or 'independent'; nor, they argue, is there warrant for reading such a requirement into the statute. [Citation omitted.] We do not read the statute as providing the broad immunity for which defendants contend. It merely removes an 'interested director' cloud when its terms are met and provides against invalidation of an agreement 'solely' because such a director or officer is involved. Nothing in the statute sanctions unfairness to Agau or removes the transaction from judicial scrutiny." *Fliegler v. Lawrence,* 361 A.2d at 221-222.

See also *Johnston v. Greene,* 35 Del. Ch. 479, 121 A.2d 919 (1956).

In *Newton v. Hornblower, Inc.,* 224 Kan. 506, we said:

"Kansas has always imposed a very strict fiduciary duty on officers and directors of a corporation to act in the best interest of the corporation and its stockholders. The duty imposed by this position of trust requires an officer or director to work for the general interests of the corporation. . . .

. . . .

"Any unfair transaction induced by a fiduciary relationship between the parties gives rise to a liability with respect to unjust enrichment of the fiduciary. Where such transaction is attacked, the burden of proof is on the fiduciary to establish the fairness of the transaction, and to this end he must fully disclose the

facts and circumstances, and affirmatively show his good faith. [Citations omitted.] Where the fairness of the transaction is challenged, there must be an affirmative showing of fairness and good faith, the burden being upon the parties seeking to sustain such transactions to prove this by clear and satisfactory evidence. [Citations omitted.]" *Newton v. Hornblower*, 224 Kan. at 514, 518.

In commenting upon 17-6304, the court stated:

"This provision of the corporate by-laws [authorizing contracts with corporate officers], with certain restrictions, has now been essentially included in the new corporation code adopted in 1972. K.S.A. 17-6304. However, neither the by-laws of the corporation nor the new code authorizes a breach of the fiduciary duty imposed upon directors and officers, and the statute also requires a full disclosure of the material facts." 224 Kan. at 522.

In *Delano v. Kitch*, 542 F.2d 550 (10th Cir. 1976), the strict duty of corporate officers and directors was stated as follows:

"It is apparent from an examination of the Kansas decisions that the prevailing rule in Kansas sets a higher or stricter fiduciary standard required of directors and officers of corporations than in some other jurisdictions. We stated in *Blazer v. Black*, 196 F.2d 139 (10th Cir.), that the Kansas rule was somewhat different from that elsewhere prevailing. This statement was in reference to a director seeking to purchase corporate shares from a stockholder. It would not seem necessary in this diversity suit to detail the development of the state doctrine. It is sufficient to point out that in the very early Kansas cases of *Thomas v. Sweet*, 37 Kan. 183, 14 P. 545; *Mulvane v. O'Brien*, 58 Kan. 463, 49 P. 607; *Stewart v. Harris*, 69 Kan. 498, 77 P. 277; *Peckham v. Lane*, 81 Kan. 489, 106 P. 464; *Consolidated Oil, Gas & Mfg. Co. v. Overfield*, 113 Kan. 294, 214 P. 809; *Abbott v. Inland Oil*, 161 Kan. 316, 167 P.2d 287, down to *Parsons Mobile Products, Inc. v. Remmert*, [216 Kan. 256, 531 P.2d 428 (1975)] the position of the Kansas courts has been clear and consistent in enforcing a very strict fiduciary duty on directors in their relation both to the corporation and to the stockholders. The court in *Parsons Mobile Products, Inc. v. Remmert*, [216 Kan. 256, 531 P.2d 428 (1975)] said: 'The officers and directors of a corporation occupy a position of trust, . . . with respect to the corporation and its stockholders.' " p. 554.

The trial court made no finding or conclusion that the interest-free loans to Nease were fair and made in good faith. A careful review of the record reveals that no such findings or conclusions could be made from the evidence in this case. The record is replete with evidence that Nease violated his fiduciary duty to the corporation and his fellow director and stockholders when he consistently made the interest-free "loans" to himself to the obvious detriment of the corporation and other stockholders. Defendant Nease, notwithstanding the attempted ratification under 17-6304, wholly failed to carry his burden of proving the intrinsic fairness of the transactions. Therefore, we are of the

opinion that the conclusions of the trial court that the loans to Nease were lawful under K.S.A. 17-6303 and were subsequently properly ratified and affirmed under K.S.A. 17-6304 were erroneous.

We turn next to the trial court's findings and conclusions that the plaintiff's action was barred by the statute of limitations [K.S.A. 60-513(a)(3), (4)], laches and estoppel. In its comments the trial court stated:

"Plaintiff's Amended Petition presents a claim based upon fraud having been practiced upon him by the defendant, Nease. It is not necessary to engage in the determination of a time when the plaintiff could reasonably have discovered the alleged fraudulent conduct. Plaintiff admits to having acquired full knowledge concerning the loans in very early July, 1980. He was also aware that the Kansas City bank loan was not only not paid or even reduced, it was increased. This action was not filed until January 7, 1983, six months after the statute of limitations had run. *Wolf v. Brungardt,* 215 Kan. 272, 524 P.2d 726 (1974); *Malone v. Young,* 148 Kan. 250, 81 P.2d 23 (1938). Plaintiff acquired considerable information in 1976 and 1978 which should have caused any prudent man, and certainly a prudent director, to investigate further. His accountant and attorney were available for consultation and advice. The records of the investment company were open for his investigation. State records were available to him as well as Federal Reserve Board records. *Jennings v. Jennings,* 211 Kan. 515, 507 P.2d 241 (1973). Mr. Oberhelman was not concerned enough to pursue any of those sources.

"By the same course of conduct, the plaintiff has slept on any right he now claims for damages through restoration of the loaned funds with interest at an appropriate rate. If he ever had a cause of action, it is now barred by laches. *Yeager v. National Cooperative Refinery Association,* 205 Kan. 504, 470 P.2d 797 (1970).

. . . .

"Plaintiff knew of these loans as early as 1976. He knew the status of the Kansas City bank debt. These matters were discussed with Nease on numerous occasions. After all that time, he must be held to have acquiesced in this loan policy and is therefore estopped to deny its validity. 19 Am. Jur. 2d *Corporations,* Sec. 1291, 1297."

While it is true that plaintiff had actual knowledge in July, 1980, that no interest was being paid on the loans and could have discovered this fact earlier, the failure of plaintiff, also a director and officer, to use reasonable diligence in connection with his duty to the corporation and to act on its behalf does not bar the derivative action finally filed on its behalf under the circumstances of this case, where new and continuing fraudulent and illegal transactions were perpetrated by Nease. The plaintiff in this action has made no attempt to bring his action in contract

upon the various notes and we conclude the trial court was correct in finding the action was one based upon fraud and that the controlling statute of limitations was two years under K.S.A. 60-513(a). However, under the facts of this case where additional funds have been diverted to Nease during the two-year period prior to filing suit, the derivative action is not barred.

In *Hornblower* we said:

"Appellants urge that simply because plaintiff Newton had a duty to the corporation to keep himself reasonably apprised of the status of the corporation he should be charged with knowledge of the 30% agreement and other expenditures and should thus be estopped to bring this action. Although this court has held that the doctrine of estoppel is generally applicable to derivative claims (see *Geiman-Herthel Furniture Co. v. Geiman*, 160 Kan. 346, 351, 161 P.2d 504 [1945]; *Fox v. Kansas Farmers' Union Royalty Co.*, 157 Kan. 297, 307, 139 P.2d 815 [1943]), the doctrine is by its very nature equitable. The doctrine of estoppel is for the protection of *innocent* persons, and as a rule only the innocent may invoke it. *Stratford Arms, Inc. v. Zoning Board of Ajustment*, 429 Pa. 132, 239 A.2d 325 (1968). Equitable estoppel is founded upon principles of morality and fair dealing and is available only for the protection of claims made in good faith. *Singewald v. Girden*, 37 Del. Ch. 252, 139 A.2d 838 (1958). The party raising the defense of estoppel is himself bound to exercise good faith in the transaction. *Board of County Commissioners v. Brown*, 183 Kan. 19, 325 P.2d 382 (1958). Thus, a party may not properly base a claim of estoppel in his favor on his own wrongful act or dereliction of duty, or fraud committed or participated in by him, or on acts or omissions induced by his own conduct, concealment or representations. 28 Am. Jur. 2d, *Estoppel and Waiver*, §§ 78, 79 (1966)." 224 Kan. at 515.

There is no doubt that Nease concealed from Oberhelman the facts surrounding the so-called loans when he represented to Oberhelman that he was paying interest at the "market rate" or "going rate." Also there can be no doubt the loans were fraudulent in nature, worked to the detriment of the corporation and constituted a breach of fiduciary duty even though they may have benefited Nease, the major stockholder. On each occasion that the notes were renewed and increased in amount by additional cash disbursements to Nease, additional fraudulent acts and breaches of fiduciary duty were perpetrated against the corporation. The instant action was initially filed January 7, 1983. By a note dated January 1, 1981, Nease acknowledged an indebtedness due the corporation of $64,714.00, nearly $20,000.00 more than the note executed the year before. January 1, 1982, the amount rose to $74,314.00 and on January 1, 1983, it was $82,712.03. By the time this matter came to trial in September, 1983, the amount had risen to $89,912.03. While the

corporate books reflect certain interest figures as having been paid in 1981 and 1982, there were no actual payments to the corporation by Nease and instead he entered upon the books an offsetting figure which he contended was payment for his services to the insurance agency. There was never any salary or compensation for Nease authorized by the board of directors; the amounts bore no reasonable relationship to the services rendered by Nease and the trial court was correct in finding that in effect the loans bore no interest. We hold that all sums owed by Nease to the corporation on or after January 7, 1981, are not barred by the statute of limitations, laches or estoppel.

One final matter remains to be determined. What is the appropriate relief to be recovered by plaintiff for and on behalf of Barnes Investment Corporation? Barnes has been required throughout all relevant periods to pay interest to a commercial lending institution on its indebtedness due that bank. We deem it equitable that Nease should not only repay the principal indebtedness but should pay interest thereon from January 7, 1981, at the same rate that the corporation has been paying interest on its commercial loans.

The judgment of the district court is reversed and the case is remanded with directions to enter judgment for plaintiff for and on behalf of Barnes Investment Corporation for all sums borrowed without authority by defendant, together with interest thereon from January 7, 1981, at the same rates interest is now accruing or has been paid by the corporation on its outstanding loans from the bank.