**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 19, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NORTHERN NATURAL GAS
COMPANY,

       Plaintiff-Counter-Defendant -
Appellant,

    v.

NASH OIL & GAS, INC.,

       Defendant-Counter-Claimant -
Appellee.

No. 07-3104

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D. Ct. No. 04-CV-1295-JTM)**

---

Alan L. Rupe (Richard A. Olmstead, with him on the briefs), Kutak Rock LLP, Wichita, Kansas, appearing for Appellant.

Jeffrey L. Carmichael, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, Kansas, appearing for Appellee.

---

Before **HENRY**, Chief Circuit Judge, **TACHA**, and **O'BRIEN**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

Plaintiff-Appellant Northern Natural Gas Company ("Northern") is a

natural gas company that operates an underground gas storage field known as the

Cunningham storage field in south-central Kansas. Defendant-Appellee Nash Oil & Gas, Inc. ("Nash") owns and operates natural gas wells, some of which are located approximately four miles north of the Cunningham storage field. Based on Northern's belief that its "storage gas" has migrated to Nash's gas wells and Nash is producing that gas, Northern commenced this action, asserting common-law claims of conversion and unjust enrichment and a statutory claim under Kan. Stat. Ann. § 55-1210. The district court granted summary judgment in favor of Nash on the common-law claims, holding they were barred by the statute of limitations or, in the alternative, collateral estoppel. The court dismissed the statutory claim under Fed. R. Civ. P. 12(b)(6). We have jurisdiction under 28 U.S.C. § 1291, and we AFFIRM.

## I. BACKGROUND

In 1977, Northern began injecting natural gas into a substratum known as the Viola formation in the Cunningham storage field. By 1993, however, studies undertaken by Northern indicated that the injected storage gas was migrating vertically from the Viola formation to a deeper formation called the Simpson formation. Subsequent studies from 1993 to 1996 further indicated that the storage gas was migrating horizontally northward toward wells operated by Nash. Northern itself concedes in its complaint that "[a]s a result of these studies, Northern became concerned that gas had migrated through a geological pathway in the Viola formation north of the storage facility towards wells operated by

Nash."

In January 1999, Northern was negotiating for the purchase of Nash's wells and mineral leases. As part of the negotiations, counsel for Northern sent Nash a letter requesting a variety of information concerning the wells. The letter also stated that Northern would not pay Nash "based upon the ability of your wells to produce storage gas," but that "Northern may be willing to consider the value of your wells as observation wells as some sort of offset to the value of the storage gas previously produced."

Counsel for Nash replied with a letter stating that Nash had specific reservations about producing the information regarding the Nash wells to Northern at that time. In the letter, counsel also asked about Northern's statement concerning Nash's alleged production of storage gas:

> Your letter also indicates that Northern would not be interested in paying anything to Nash Oil & Gas based upon the ability of their wells to produce storage gas, but you might be willing to consider paying for the wells as observation wells. Does, in fact, Northern have credible information available to it to suggest that Nash Oil & Gas, Inc., wells are producing storage gas?

In response, counsel for Northern stated in a February 1999 letter that samples taken from Nash's wells preliminarily indicated that the gas being produced by the wells resembled storage gas much more than native gas.

In March 2000, counsel for Northern sent another letter to Nash. The letter explained that Northern continued to investigate whether the gas produced by

Nash's wells was storage gas, but that the investigation was ongoing and may not be complete until additional tests could be undertaken. The letter also requested that Nash sign an agreement that purported to toll the statute of limitations for any claims the companies might have against each other. Despite the threat of imminent litigation if Nash did not agree to the tolling provision, Nash declined to sign the proposed agreement.

The same year, Northern hired Michael Begland, a petroleum engineer, to construct a computer-generated reservoir-simulation model. Reservoir simulation is used to predict the flow of gas through porous media. In 2003, the model was finished, and based on its data as well as data from 2002, Northern concluded that several billion cubic feet of storage gas had migrated from the Cunningham storage field and was being produced by Nash.

On September 3, 2004, Northern filed the complaint in this case. In it, Northern alleges that gas has migrated northward from the Cunningham storage facility and is being produced at the Nash wells. Northern brings common-law claims for conversion and unjust enrichment and a statutory claim under Kan. Stat. Ann. § 55-1210. The district court granted summary judgment in favor of Nash on the common-law claims based on the statute of limitations or, in the alternative, collateral estoppel based on the jury's answers to special interrogatories in a similar action Northern had previously litigated against another defendant. The district court dismissed the claim under § 55-1210

pursuant to Fed. R. Civ. P. 12(b)(6).[1]  Northern appeals as to all claims.

## II.  DISCUSSION

We review the entry of summary judgment de novo.  *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1222 (10th Cir. 2008).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party.  *Fye*, 516 F.3d at 1222.

A.    Conversion and Unjust Enrichment

In Kansas, the statute of limitations for conversion is two years.  Kan. Stat. Ann. § 60-513(a)(2).  Under the so-called "discovery rule," a cause of action for conversion accrues when the "fact of injury becomes reasonably ascertainable to the injured party."  *Id.* § 60-513(b); *see also Dreiling v. Davis*, 176 P.3d 197, 201 (Kan. Ct. App. 2008) (describing § 60-513(b) as the discovery rule); *Clark Jewelers v. Satterthwaite*, 662 P.2d 1301, 1304 (Kan. Ct. App. 1983) ("[A] cause

---

[1]The district court considered evidence beyond the pleadings to dismiss the claim under § 55-1210; therefore, it should have converted Nash's motion to dismiss to one for summary judgment.  *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  Northern, however, does not appeal the propriety of this procedure, so we will not reverse on this basis and will review the dismissal under the standard applicable to an entry of summary judgment.

of action in tort for conversion or for the recovery of personal property accrues when substantial injury first appears or when it becomes reasonably ascertainable.").

The statute of limitations for unjust enrichment is three years. Kan. Stat. Ann. § 60-512; *Lightcap v. Mobil Oil Corp.*, 562 P.2d 1, 13 (Kan. 1977). Although the parties assume in their briefing that the discovery rule similarly applies to a claim for unjust enrichment, they do not cite and this Court has not located any authority to support this proposition. Nevertheless, because Northern's claim for unjust enrichment is untimely even under the discovery rule, we need not decide the issue and assume for purposes of this appeal that both the claim for conversion and the claim for unjust enrichment accrued when Northern's injury became "reasonably ascertainable."

"The phrase 'reasonably ascertainable' means that a plaintiff has the obligation to reasonably investigate available sources that contain the facts of the [injury] and its wrongful causation." *Kelley v. Barnett*, 932 P.2d 471, 474 (Kan. 1997) (quotations omitted). Moreover, "'reasonably ascertainable' does not mean 'actual knowledge.'" *Davidson v. Denning*, 914 P.2d 936, 948 (Kan. 1997). In this case, the district court determined that based on the 1999 and 2000 correspondence between Northern and Nash, Northern could reasonably ascertain at that time that Nash was producing Northern's storage gas. We agree. At that point, Northern suggested that Nash was producing storage gas, stated that

samples from Nash's wells supported Northern's position that the produced gas was storage gas, and urged Nash to agree to toll the statute of limitations so that Northern could continue its investigation. Although Northern may not have known to a certainty that the gas was storage gas, it is clear that such fact was capable of being known to Northern at that time. Thus, Northern's injury was reasonably ascertainable by 2000 at the latest, and the claims for conversion and unjust enrichment, which were filed in 2004, are untimely.

Northern contends that even if its injury was reasonably ascertainable by 2000, its claims are not time-barred because Nash's acts (the production of storage gas) constitute a continuing tort entitling Northern to recover damages for each act occurring during the two- or three-year period immediately preceding this lawsuit. In our judgment, the Kansas Supreme Court would not recognize the continuing-tort exception to the statute of limitations for these claims. *See Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1228 (10th Cir. 2001) ("When no decision of a state's highest court has addressed an issue of that state's law, the federal court confronted with that issue must predict how the state's highest court would rule." (quotations and alteration omitted)).

It is true that Kansas has recognized a form of the "continuing tort" or "continuing wrong" theory in nuisance cases based on flooding. The Kansas Supreme Court has explained:

> There are cases in which the original act is considered as a

> continuing act, and daily giving rise to a new cause of action. Where one creates a nuisance, and permits it to remain, so long as it remains it is treated as a continuing wrong, and giving rise, over and over again, to causes of action.

*Henderson v. Talbott*, 266 P.2d 273, 279 (Kan. 1954); *see also Gowing v. McCandless*, 547 P.2d 338, 342 (Kan. 1976) ("Where the injury or wrong is classified by the courts not as original or permanent, but as temporary, transient, recurring, continuing or consequential in nature, . . . the limitation period starts to run only when the plaintiffs' land or crops are actually harmed by overflow, and for purposes of the statute of limitations, each injury causes a new cause of action to accrue, at least until the injury becomes permanent.").

Kansas has also suggested that the rule applies in a shareholder derivative action where the shareholders did not know of the first instances of the defendant's wrongdoing. *See Oberhelm v. Barnes Inv. Corp.*, 690 P.2d 1343, 1352–53 (Kan. 1984). But Kansas has consistently refused to apply the theory in other contexts. *See P.W.P. v. L.S. & Johnson Co. Mental Health Ctr.*, 969 P.2d 896, 898, 904–05 (Kan. 1998) (claims for negligence and intentional infliction of emotional distress are not continuing torts); *Lockridge v. Tweco Prods., Inc.*, 497 P.2d 131, 133, 137–38 (Kan. 1972) (claim for misappropriation of a trade secret is not a continuing tort). Indeed, the federal district court in Kansas has refused to apply the doctrine to claims for conversion, fraud, and intentional infliction of emotional distress based, in part, on this very reason. *See Cline v. So. Star Cent.*

*Gas Pipeline*, 356 F. Supp. 2d 1203, 1214–1215 (D. Kan. 2005) ("Kansas has only applied the theory in limited circumstances involving a continuing nuisance.").

Moreover, Kansas courts have repeatedly emphasized that it is the role of the state legislature, rather than the state courts, to create exceptions to the statute of limitations. *See State v. Mills*, 707 P.2d 1079, 1081 (Kan. 1985) ("It is not the province of the court to fashion exceptions to the statute of limitations as that task is left to the legislature."); *Handy v. Reed*, 81 P.3d 450, 456 (Kan. Ct. App. 2004) ("It is fundamental to our system of government that the legislature makes our laws dealing with periods of limitations and the judiciary interprets and enforces such laws. . . . [S]tatutes of limitations are creatures of the legislature, expressing public policy on the right to litigate. The shelter afforded by the running of the statute of limitations . . . is subject to a large degree of legislative control." (quotations and alterations omitted)) .

Given Kansas's reluctance to apply the theory in cases other than those involving a continuous nuisance, as well as the directive of the Kansas courts not to engage in judicially created exceptions to the statute of limitations, we hold that Kansas would not apply the continuing-tort doctrine to claims for conversion or unjust enrichment. *See Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993) ("As a federal court, we are generally reticent to expand state law without clear guidance from its highest court."). Therefore, summary judgment on these claims

was appropriate based on the statute of limitations, and we need not address the district court's alternative reasoning premised on collateral estoppel.

B.      Kan. Stat. Ann. § 55-1210

Before addressing Northern's claim under § 55-1210, it is helpful to review briefly the historical rights of natural gas injectors and landowners to migrated gas. Under the common-law rule of capture, "the owner of a tract of land acquired title to the oil and gas which the owner produced from wells drilled thereon even though it could have been proved that part of such oil or gas migrated from adjoining lands." *Mobil Exploration & Producing U.S. Inc. v. State Corp. Comm'n of Kan.*, 908 P.2d 1276, 1282 (Kan. 1995); *see also Land and Natural Resources Survey*, 71 Denv. U. L. Rev. 1017, 1028 (1994) ("The law of capture embodies a simple concept of ownership; whoever captures it owns it, regardless of where it was located."). Due to this common-law rule, gas producers protected their interests by drilling offset wells to prevent migration.

In 1993, however, the Kansas legislature abolished the rule of capture with respect to migrated gas without limit to where the gas migrates. Kan. Stat. Ann. § 55-1210(a)–(b), (c)(1). Now, an injector of natural gas, such as Northern, does not lose property rights to injected gas when such gas migrates beyond the boundaries of the injector's storage facilities. Specifically, the statute provides:

> (a) All natural gas which has previously been reduced to possession, and which is subsequently injected into underground storage fields, sands, reservoirs and facilities, whether such storage rights were

-10-

acquired by eminent domain or otherwise, shall at all times be the property of the injector, such injector's heirs, successors or assigns, whether owned by the injector or stored under contract.

(b) In no event shall such gas be subject to the right of the owner of the surface of such lands or of any mineral interest therein, under which such gas storage fields, sands, reservoirs and facilities lie, or of any person, other than the injector, such injector's heirs, successors and assigns, to produce, take, reduce to possession, either by means of the law of capture or otherwise, waste, or otherwise interfere with or exercise any control over such gas. . . .

(c) With regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased:

(1) The injector, such injector's heirs, successors and assigns shall not lose title to or possession of such gas if such injector, such injector's heirs, successors or assigns can prove by a preponderance of the evidence that such gas was originally injected into the underground storage.

*See id.* The statute also creates a limited right enabling the injector to conduct testing in order to establish the ownership of gas being produced from wells on property that adjoins the injector's storage facility. *Id.* § 55-1210(c)(2).

In this case, Northern's complaint purports to set forth an independent cause of action under § 55-1210(c)(1) that would entitle it to declaratory relief and an injunction prohibiting Nash from producing Northern's migrated gas. That subsection, however, does not create a new cause of action; rather, it simply abolishes the common-law rule of capture with respect to property rights of migrated gas such that a plaintiff is no longer precluded from bringing some other cause of action (conversion, breach of contract, or unjust enrichment, for

example) to enforce those rights. Indeed, by its plain terms, the provision states that a natural-gas injector "shall not lose title to or possession of" migrated gas if the injector can establish that it originally injected the gas into its own storage facility—in this way, the provision invalidates the rule of capture. The language of the provision does not, however, indicate that the legislature further intended to replace or supplement traditional common-law claims with a new statutory cause of action.[2] Thus, because Northern's complaint asserts a free-standing claim under § 55-1210(c)(1), the district court correctly dismissed it.

Moreover, to the extent Northern's complaint seeks testing under § 55-1210(c)(2), the district court was correct—as Northern concedes in its brief—that an injector may conduct tests only on wells of adjoining property owners. Therefore, because Nash's wells are located on land that does not adjoin the land over the Cunningham storage field, Northern is not entitled to an order permitting testing on Nash's wells.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM.

---

[2] We also note that faced with somewhat analogous circumstances, both this Court and the Kansas Supreme Court reached the same conclusion with respect to another subsection of this statute. *See Beck v. N. Natural Gas Co.*, 170 F.3d 1018, 1024 (10th Cir. 1999) (stating that "§ 55-1210(c)(3) does not create an independent statutory cause of action for trespass"); *Hayes Sight & Sound, Inc. v. ONEOK, Inc.*, 136 P.3d 428, 455–56 (Kan. 2006) (citing *Beck* with approval and agreeing that "subsection (c)(3) does not create a cause of action").

Northern Natural Gas Company v. Nash Oil & Gas, Inc., No. 07-3104

**HENRY**, Chief Judge, dissenting:


Unlike the majority, I am not sure that the Kansas Supreme Court would decline to apply the continuing tort doctrine. I agree that that court has declined to recognize the doctrine in some contexts. However, it seems to me that the cases cited by the majority do not involve the kind of claims advanced by Northern here, which allege acts of conversion and unjust enrichment within the two and three-year periods immediately prior to the filing of this lawsuit.

In analogous circumstances, courts of other states have held that a plaintiff may recover for tortious acts within the limitations period, even if the defendant committed other similar acts outside that period. See, e.g., Narragansett Elec. Co. v. Carbone, 898 A.2d 87, 101 (R.I. 2006) (allowing a plaintiff to recover on conversion and unjust enrichment claims concerning electricity wrongfully obtained during the limitations period, even though it was before the limitations period that the defendants had installed an illegal bypass switch to avoid billing); Young v. Young, 709 P.2d 1254, 1259 (Wyo. 1985) (allowing the plaintiff to recover for royalty payments wrongfully withheld during the limitations period and reasoning that "conversion is a tortious act[,]" "[the defendant's] failure to remit to [the plaintiff] her royalty share as received was a recurring tort of a sort which involved separate and successive injuries from separate and successive acts[,]" and that "[the defendant's conduct] is an exemplification of periodic

recurring wrongful acts–a series of tortious acts, each of which could be the basis for a separate claim, not continuing damage from an original tort").

The rationale of these decisions is that "a wrongdoer cannot and should not gain a prescriptive right to continue wrongful and injurious acts. While [the defendant] has had the benefit of the statute of limitations for an extended period and its useful purposes preserved, no permanent right is bestowed to continue such wrongful acts during the limitations period immediately preceding the commencement of [the plaintiff's] action." Young, 709 P.2d at 1259. Notably, as Northern observes, the federal district court appears to have applied this principle in the similar case that Northern filed against Trans Pacific Oil Corporation, allowing Northern to seek damages arising out of the production of gas for the two and three-year periods immediately preceding the filing of the complaint. See Aplt's Br. at 29 (quoting the jury instructions in Northern Natural Gas Co. v. Trans Pacific Oil Corp., 10th Cir. case no. 05-3411).

Given the plausible arguments that can be made in support of this view, and the fact that the Kansas Supreme Court has not definitely resolved this question in these circumstances, I would certify this question of state law to the Kansas Supreme Court.